SUSAN M. CHEHARDY, Judge.
 

 |2On March 14, 2007, the Jefferson Parish District Attorney filed a bill of information charging defendant, David J. Stewart, with first degree robbery in violation of La. R.S. 14:64.1. Defendant was arraigned and pled not guilty.
 

 On October 23, 2007, trial commenced before a twelve-person jury, which unanimously found defendant guilty as charged. On August 15, 2008, the trial court sentenced defendant to imprisonment at hard labor for 25 years without benefit of parole, probation, or suspension of sentence.
 
 [1]
 

 Facts
 

 At trial, Corey Bowles testified that, on January 3, 2007, he met his uncle, David Stewart, around lunchtime at Tastee Donuts on the corner of Transcontinental Drive and West Esplanade Avenue in Me-tairie, Louisiana. Both men went to the restaurant often. David Stewart went to Tastee Donuts almost every day to eat and to play video poker. Stewart knew that the manager kept a lock box with money to pay the video poker winners. On that day, both men needed money so they hatched a plan to rob the donut shop.
 

 | ¡¿Pursuant to their plan, the men returned to Tastee Donuts after dark. They parked in the lot behind the restaurant. Stewart went inside Tastee Donuts, briefly played video poker, and scoped out the restaurant, while Bowles sat in the passenger seat of his truck. They were communicating by cell phones.
 

 At trial, another Tastee Donuts customer testified that, on the night of January 3, 2007 a few minutes before the robbery, Stewart, who was playing video poker, received a cell phone call and quickly left the shop. A few minutes later, Bowles, who was dressed all in black, entered the donut shop through the front door. Bowles testified that, as he entered the restaurant, his face was exposed until he pulled a white knit ski-mask down over his face.
 

 Gustavo Aguilar, an employee at Tastee Donuts, and his friend, Brent Thompson, were sitting at a table near the front door of the restaurant. Aguilar testified that he was able to see the robber’s face as he entered the restaurant. Aguilar positively identified Bowles as the gunman. Bowles, who had a BB gun in his hand, grabbed Thompson and dragged him toward the
 
 *279
 
 back of the restaurant. Aguilar jumped up, went behind the counter, and told the manager, Chris Tujaque, that they were being robbed. Aguilar testified that he went straight out of the restaurant’s back door and dialed 911.
 
 [2]
 

 When Bowles walked to the kitchen area, he saw that there were four more people there. He panicked, found the lock box,
 
 [3]
 
 broke it open, grabbed the money, ran out the back door, and began walking toward CVS Pharmacy.
 
 [4]
 

 Bowles ran behind a nearby apartment building where Stewart was supposed to pick him up. At 7:57 p.m., Bowles used his cell phone to call Stewart to pick him up. After Stewart picked up Bowles, the men parked in front of Stewart’s ^girlfriend’s house, split the money from the robbery,
 
 [5]
 
 then went their separate ways for a while. Later on, Bowles got a room at Shoney’s Inn in Metairie, and the men spent the night there.
 

 On January 17, 2007, about two weeks after the robbery, Detective David Masca-ro of the Jefferson Parish Sheriffs Office (hereinafter “JPSO”) questioned Bowles about the robbery. Bowles admitted that he had robbed the Tastee Donuts and three other Metairie fast-food establishments. In his recorded statement, Bowles said that he robbed the Tastee Donuts by himself; however, Detective Mascaro testified that Bowles verbally implicated Stewart in that robbery.
 

 At trial, Bowles testified that he would not say in his recorded statement that his uncle, David Stewart, was involved because he wanted to protect him; however, Detective Mascaro testified that Bowles would not go on tape about his uncle because Bowles was scared and did not know what his uncle would do. One week after Bowles’ first statement, JPSO Sergeant John Carroll took another recorded statement from Bowles where he implicated Stewart in the Tastee Donuts robbery.
 

 As part of his investigation, the detective obtained Bowles’ and Stewart’s cell phone records. The records, which were properly authenticated by company representatives, reflected that, in the hour surrounding the robbery, Bowles called defendant at 7:00 p.m., 7:49 p.m., and 7:57 p.m. Furthermore, the calls at 7:00 p.m. and 7:57 p.m. were each two minutes in duration. The call at 7:49 p.m. was a very short duration, which indicates a very short, dropped, or unanswered call.
 

 Bowles testified that he had pled guilty to four counts of first degree robbery, but had not yet been sentenced. He also testified that the prosecutor had not promised him anything in exchange for his testimony, nor did she tell him he [¿would get a certain sentence if he testified. On October 19, 2007, Bowles gave a statement to his attorney, Gerard Archer, again implicating defendant in the Tastee Donuts robbery.
 

 After the State rested its case, the defense called several alibi witnesses who testified that they saw defendant at a Narcotics Anonymous meeting at St. John’s Church on Williams Boulevard in Kenner
 
 *280
 
 on the night of the robbery. They all remembered that night because defendant received his five-year sobriety medallion and LSU played in the Sugar Bowl.
 

 One witness testified that, approximately 8:05 p.m., she saw defendant when she went into the meeting. A second witness testified that she arrived at the meeting at approximately 7:55 p.m., and defendant pulled into the lot at the same time, and they walked into the meeting together. She remembered that defendant was there until 9:30 p.m. when the meeting ended. A third witness testified that he had known defendant, who he referred to as his son, for more than 30 years. Defendant has been living at his house since September of 2005. He recalled seeing defendant at the meeting at approximately 8:15 p.m.
 

 Michelle Wise testified that defendant was her sister-in-law’s long-time boyfriend. She remembered that, on the night of January 3, 2007, she was at her sister-in-law’s house for a Sugar Bowl party but neither defendant nor his truck was at the house until 9:45 p.m. When he came into the house, he showed everyone his five-year sobriety medallion. After all of the evidence and testimony was presented, the twelve-person jury found defendant guilty as charged of first-degree robbery.
 

 On appeal, defendant asserts three assignments of error: first, “defense counsel’s assistance was defective by failing to object to inadmissible hearsay at trial and this denied the defendant his Sixth Amendment right to effective ^assistance of counsel;” second, “the trial court erred by refusing to disqualify juror James Daree although he was a neighbor of the co-defendant, Corey Bowles; and third, “David Stewart was denied effective assistance of counsel at trial when his attorney failed to request a jury instruction on accomplice testimony.”
 

 In his first and third assignments of error, defendant argues that his trial counsel was ineffective so we will address them together. In his first assignment, defendant argues that his trial counsel was ineffective for failing to object to inadmissible hearsay at trial.
 
 [6]
 
 He specifically objects to the introduction of out-of-court statements made by Corey Bowles to Detective Mascaro and Sergeant Carroll, including information regarding cell phone calls he made to defendant on the night of the robbery and the ski mask he wore during the robbery. He also objects to the use of out-of-court statements made by Stewart Holmes, who did not testify at trial, to corroborate Bowles’ testimony. He argues that this inadmissible evidence was not harmless and contributed to the jury verdict.
 

 The State responds that defendant’s claim should be relegated to post-conviction proceedings. Alternatively, the State contends that defendant’s trial counsel was not ineffective, as he introduced Bowles’ and Stewart’s out-of-court statements as part of his trial strategy to show that Bowles’ was lying about defendant’s involvement in the robbery.
 

 Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a de
 
 *281
 
 fendant is entitled to effective assistance of counsel.
 
 State v. McDonald,
 
 04-550 (La.App. 5 Cir. 11/16/04), 889 So.2d 1039, 1042,
 
 writ denied,
 
 04-3088 (La.4/1/05), 897 So.2d 599. A claim of ineffective 17assistance of counsel must satisfy the two-prong test set forth in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 State v. Dabney,
 
 05-53 (La.App. 5 Cir. 6/28/05), 908 So.2d 60, 63.
 

 Under the
 
 Strickland
 
 test, the defendant must show: (1) that counsel’s performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance prejudiced the defense.
 
 State v. Dabney,
 
 908 So.2d at 63,
 
 citing, Strickland v. Washington,
 
 466 U.S. at 687, 104 S.Ct. at 2064. This requires showing that counsel’s errors were so serious as to deprive the defendant of a trial whose result is reliable.
 
 Id.
 
 The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 State v. Dabney,
 
 908 So.2d at 63,
 
 citing, Strickland v. Washington,
 
 466 U.S. at 694, 104 S.Ct. at 2068.
 

 A court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.”
 
 State v. Dabney,
 
 908 So.2d at 63,
 
 citing, Strickland v. Washington,
 
 466 U.S. at 689, 104 S.Ct. at 2065. There is no precise definition of reasonably effective assistance of counsel, so any inquiry into the effectiveness of counsel must be specific to the facts of the case, and must take into consideration the counsel’s perspective at the time.
 
 State v. LaCaze,
 
 99-0584 (La.1/25/02), 824 So.2d 1063, 1078-79,
 
 cert. denied,
 
 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002). The Sixth Amendment does not guarantee errorless counsel or counsel judged ineffective by hindsight.
 
 Id.
 

 [gRather than on direct appeal, a claim for ineffective assistance of counsel is most appropriately addressed through an application for post-conviction relief filed in the trial court where a full eviden-tiary hearing can be conducted.
 
 State v. McDonald,
 
 889 So.2d at 1042. However, when the record contains sufficient evidence to rule on the claim’s merits and the issue is properly raised on appeal by assignment of error, it may be addressed in the interest of judicial economy.
 
 Id.
 

 Because defendant’s trial counsel did not object to the admissibility of the testimony in question, defendant argues on appeal that he was ineffective.
 
 [7]
 
 On appeal, defendant argues that Detective Mas-caro’s testimony about Bowles’ out-of-court
 
 *282
 
 statements about his cell phone usage on the day of the robbery constituted hearsay. At trial, Detective Mascaro testified that he talked to Bowles about his cell phone records. According to Detective Mascaro, Bowles said that he called defendant before the robbery to ask if the “coast was clear” and to advise him to get out of the business so he could rob it. Bowles also told the detective that he called defendant after the robbery to pick him up. At trial, Bowles did not testify that he called defendant just before the robbery; however, he did testify that he called defendant immediately after the robbery to pick him up.
 

 Second, defendant objects to Detective Mascaro’s testimony that Bowles implicated defendant in his statement to Sergeant Carroll. Third, defendant objects to Sergeant Carroll’s testimony about Bowles’ out-of-court statements about the mask he wore during the robbery.
 

 |3The record reflects that Corey Bowles gave three recorded statements. In Bowles’ first statement, Bowles said that he committed the Tastee Donuts’ robbery by himself. Bowles also admitted to committing three other robberies with his friend, Stewart Holmes. Bowles stated that he was the gunman in all of the robberies except one. Bowles stated that he robbed Tastee Donuts because he was there all the time and knew robbing it would be easy. He also stated that he parked his vehicle behind the donut shop, and that he wore all black and used a knit cap he had made into a mask to hide his face.
 

 In his second statement, Bowles admitted that defendant was the “mastermind” behind the robbery. Bowles stated that defendant told him where the lock box was kept. Defendant also drove him to Tastee Donuts, waited outside, told him when to go inside, how to leave through the back door, and picked him up after the robbery. Bowles also said, in that statement, that he got $400.00 and defendant got $800.00 from the Tastee Donuts robbery. When asked why defendant got more money, Bowles responded that defendant owed money to someone. Bowles also admitted that the white ski mask the detective found in a safe was the mask that he wore during the Tastee Donuts robbery.
 

 In his third statement (given to his attorney), Bowles again implicated defendant in the Tastee Donuts’ robbery, repeating the substance of his second statement regarding that robbery. Bowles added that defendant knew that Bowles was going to use a BB gun to commit the robbery.
 
 Analysis
 

 Upon review, we find that the record before us contains sufficient evidence to rule on this claim’s merits and we will address this issue in the interest of judicial economy. At trial, defense counsel fought to introduce all three of Bowles’ recorded statements into evidence. Defense counsel wanted to cast doubt | inon Bowles’ incriminating testimony about defendant. He introduced the statements so the jurors could see the inconsistencies, use their common sense, and doubt Bowles’ incriminating testimony.
 

 Defense counsel argued in his closing argument that Bowles committed the first robbery at Tastee Donuts on his own, just like he stated in his first statement. He indicated that Bowles was familiar with Tastee Donuts because he frequented it often and, therefore, did not need defendant’s help in robbing it, especially considering that it was a small place. He pointed out that Bowles panicked during that first robbery then realized he needed help to commit the next three robberies.
 

 Defense counsel noted, in his closing argument, that there was an eight-day pe-
 
 *283
 
 riocl with no robberies after the first robbery on January 3, 2007. However, the second, third, and fourth robberies occurred in quick succession: January 11, January 13, and January 17. Defense counsel argued that if Bowles had, in fact, committed the first robbery with defendant, there was no reason to find someone else with whom to commit the other ones. He asserted that, if Bowles had actually committed the first robbery with defendant’s help, it made no sense for Bowles to change his plan and use Holmes, another crack addict, as his accomplice. Defense counsel argued that Bowles was lying about defendant’s involvement in the hope of receiving a reduced sentence on his first-degree robbery convictions.
 

 In support of his trial strategy, defense counsel successfully moved the court to admit Bowles’ first statement to the JPSO and his third statement to his attorney for all purposes, even though the State only wanted to introduce them for record purposes. Additionally, defense counsel had no objection when the State introduced the second statement into evidence. Further, during the cross-examination of Bowles, defense counsel introduced Bowles’ second statement as his own exhibit.
 

 InThe record also indicates that defense counsel cross-examined Bowles regarding the discrepancies among his statements. He noted that, in Bowles’ first statement, he told the detective he committed the robbery because he needed the money, but in the second statement, Bowles said defendant needed the money. Bowles testified that after the robbery, he and defendant went to defendant’s girlfriend’s house, stayed outside in the truck, and split the money; however, in his prior statements, he never included that detail.
 

 Under the circumstances, defense counsel’s choice to introduce a co-defendant’s three inconsistent statements “might be considered sound trial strategy.”
 
 State v. Dabney,
 
 908 So.2d at 63. While opinions may differ on the advisability of such a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions.
 
 State v. Brooks,
 
 505 So.2d 714, 724 (La.1987),
 
 cert. denied,
 
 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.
 
 Id,.
 
 If an alleged error falls “within the ambit of trial strategy,” it does not establish ineffective assistance of counsel.
 
 State v. Gordon,
 
 00-1013 (La.App. 5 Cir. 11/27/01), 803 So.2d 131, 147,
 
 writs denied,
 
 02-0362 (La.12/19/02), 833 So.2d 336 and 02-0209 (La.2/14/03), 836 So.2d 134.
 
 [8]
 
 Here, we cannot say that defendant has overcome the “strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 

 Furthermore, we also cannot say that defendant established that the deficient performance prejudiced the defense.
 
 State v. Dabney,
 
 908 So.2d at 63,
 
 citing, Strickland v. Washington,
 
 466 U.S. at 687, 104 S.Ct. at 2064. First of all, | ^Detective Mascaro’s testimony regarding cell phone calls on the night of the robbery was cumulative and corroborative of other evi
 
 *284
 
 dence. Bowles and representatives from the cell phone companies testified extensively regarding the cell phone calls between defendant and Bowles on the day of the robbery and particularly regarding calls within an hour before and after the robbery. The cell phone representatives testified that the records showed that, on the night of the robbery, Bowles called defendant a few minutes before the robbery at 7:49 p.m. and immediately after the robbery at 7:57 p.m. Additionally, Bowles testified that he called defendant after the robbery to pick him up. Because Detective Mascaro’s testimony about Bowles’ cell phone calls was cumulative and corroborative of other evidence, any error in admission is harmless.
 
 Hester, supra.
 

 Secondly, Sergeant Carroll testified that Bowles gave him a statement on January 24, 2007, implicating defendant in the Tas-tee Donuts robbery. Therefore, the testimony of Detective Mascaro regarding that statement was cumulative and corroborative of other evidence. As such, any error in the admission of Detective Mascaro’s testimony regarding this matter was harmless error as well.
 
 Hester, supra.
 

 Thirdly, Sergeant Carroll testified that Bowles admitted that he wore a white ski mask during the Tastee Donuts’ robbery. Bowles discussed wearing a ski mask during his trial testimony. Again, although it may have been inadmissible hearsay, Sergeant Carroll’s testimony was cumulative and corroborative of Bowles’ own testimony. As such, the introduction of Carroll’s statement constitutes harmless error.
 

 Fourth, defendant objects to Detective Mascaro’s testimony about an unrelated arrestee’s out-of-court statements. At trial, Detective Mascaro testified that, on January 17, 2007, Stewart Dennis Holmes gave a statement admitting to [13his involvement in three robberies with Corey Bowles. In that statement, Holmes denied involvement with the robbery at Tastee Donuts. Detective Mascaro further testified that Holmes’ statement corroborated Corey Bowles’ statements about Holmes’ involvement in three robberies.
 

 Holmes did not testify at trial. However, Corey Bowles implicated Stewart Dennis Holmes in three other robberies and exculpated Holmes from involvement in the robbery that is the subject of this charge. Although Detective Mascaro’s testimony regarding Stewart Holmes’ out-of-court statements appears to be inadmissible hearsay, it was cumulative and corroborative of Bowles’ testimony. As such, any ei-ror in the admission of that testimony was harmless error as well.
 
 Hester, supra.
 
 Based on the foregoing, we cannot say that defendant overcame the strong presumption that his counsel’s choice regarding hearsay was reasonable or that his performance prejudiced the defense.
 

 In his third assignment of error, defendant argues that his trial counsel was ineffective because he failed to request a jury instruction on accomplice testimony. He contends that the jury should have been instructed that Bowles’ testimony was to be considered with great caution due to the fact that he was an accomplice in the crime. Defendant contends that by failing to request such an instruction, his trial counsel inadvertently bolstered the credibility of the State’s evidence.
 

 The State responds that this claim should be addressed through an application for post-conviction relief. Alternatively, the State argues that defendant has failed to demonstrate that his trial counsel performed deficiently or that defendant was prejudiced. The State asserts that the instruction was unnecessary because there was material corroboration of Bowles’ testimony. The State further as
 
 *285
 
 serts that the credibility of accomplice testimony was adequately covered by the trial court’s general charge on the credibility of witnesses.
 

 11 ¡Although this claim for ineffective assistance of counsel could also be addressed through an application for post-conviction relief, we find that the record is sufficient to rule on the merits of the claim. In the interest of justice, we will consider defendant’s argument on this issue, also.
 

 Under La.C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
 
 State v. Smith,
 
 04-340 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 288-89. A requested jury charge must be supported by the evidence.
 
 Id.,
 
 888 So.2d at 289. The failure to read a requested special jury charge constitutes reversible error only when there is prejudice to the substantial rights of the defendant or the violation of some constitutional or statutory right.
 
 Id.
 

 When the State relies upon the testimony of an accomplice, the trial court should instruct the jury to treat an accomplice’s testimony with caution unless there is material corroboration of the accomplice’s testimony.
 
 State v. Smith,
 
 888 So.2d at 289,
 
 citing, State v. Schaffner,
 
 398 So.2d 1032, 1035 (La.1981). It is enough if there is evidence that confirms material points in an accomplice’s story, the defendant’s identity and some relationship to the situation.
 
 State v. Schaffner,
 
 398 So.2d at 1035. Whether such an instruction should be given is within the sound discretion of the trial court.
 
 [9]
 

 State v. Smith,
 
 888 So.2d at 289,
 
 citing, State v. Schaffner, supra.
 

 In the instant case, Bowles’ testimony was materially corroborated by numerous witnesses. Bowles testified that, just before the robbery, he and defendant went to Tastee Donuts. When they arrived, defendant went inside toj^assess the situation and see if “the coast was clear,” while Bowles remained in the truck. Defendant surveyed the scene as he played video poker.
 

 Chris Tujaque, the manager on duty at Tastee Donuts, testified that, on the night of the robbery, two customers were in Tastee Donuts playing video poker: defendant and a woman. Approximately ten minutes before the robbery, Tujaque went out the back door to return a shopping-cart to a nearby business. As he walked out the back door, he noticed Bowles sitting in the passenger seat of a truck
 
 [10]
 
 in the parking lot behind Tastee. Tujaque thought that it was strange that Corey would be sitting outside in the truck on a cold night. After returning the shopping cart, Tujaque was back inside Tastee Donuts between 7:30 and 8:00 p.m. He saw defendant and the woman still playing video poker.
 

 Katherine Pardo, the woman playing video poker next to defendant, testified that defendant received several calls on his cell phone while he played video poker. She remembered that, after one of those
 
 *286
 
 calls, defendant got up and left very hurriedly, which she thought was unusual. A short while later, the robbery occurred.
 
 [11]
 
 Tujaque testified that defendant was not present during the robbery.
 

 Bowles also testified that he and defendant communicated many times on January 3, 2007 using their cell phones. Representatives of two cell phone companies showed that there were approximately 44 calls between Bowles and defendant on the day of the robbery. The records specifically showed that Bowles called defendant at 7:49 p.m., a few minutes before the robbery, and at 7:57 p.m., immediately after the robbery. At 7:56 p.m., Gustavo Aguilar reported the robbery in progress to 911.
 

 hJBowles testified that defendant told him where the video poker lock box was kept. Several Tastee Donuts employees testified that defendant was in there several times every day, to eat and play video poker. Further, the manager had hired him to do renovation projects, such as putting in the “drive-thru” window. In fact, defendant felt so comfortable at the restaurant that he would walk behind the counter to serve himself or other customers, without the manager’s permission. The other witnesses agreed that Bowles did not frequent Tastee Donuts that often.
 

 In light of the foregoing, we find that the evidence presented at trial materially corroborated the accomplice’s testimony. Additionally, the credibility of the accomplice’s testimony was adequately covered by the trial court’s general charge on credibility of witnesses.
 
 See State v. Smith,
 
 888 So.2d at 289,
 
 citing State v. Schaffner,
 
 398 So.2d at 1035. Further, the jury was properly instructed that they could consider the interest that the witness might have for so testifying against defendant.
 
 See State v. Castleberry,
 
 98-1388, p. 14 (La.4/13/99), 758 So.2d 749, 762,
 
 cert. denied,
 
 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). Thus, we cannot say that defendant has overcome the strong presumption that his trial counsel’s conduct was within the wide range of reasonable professional assistance by proving that his performance was deficient or, if deficient, then prejudicial.
 

 Returning to his second assignment of error, defendant argues that the trial court erred by refusing to disqualify juror James Darce although he was a neighbor of the co-defendant Corey Bowles. Defendant argues that the trial court erred by denying his mid-trial motion to disqualify juror James Darce after he revealed that he was the neighbor
 
 of
 
 Bowles, an essential prosecution witness. The State responds that the trial court did not abuse its discretion by denying the motion, since Darce assured the court he could still be objective.
 

 |17At the end of the second day of trial, the trial judge excused all the jurors, except for Darce, who had told the bailiff that he realized that he lived two doors down from Bowles’ father. Darce told the trial judge that, when the names of the witnesses were initially read, he did not recognize any of them. However, when Bowles gave his address, Darce realized Bowles lived two doors down from him. Darce said that he did not associate with Bowles and that he had no association with the Bowles’ family other than to wave and say “hello.” When the trial judge asked
 
 *287
 
 Darce whether he brought that information to the court’s attention because it was the right thing to do, Darce answered affirmatively.
 

 The prosecutor said she did not have a problem with Darce continuing to be a juror, but defense counsel objected to it. Afterwards, the trial judge excused Darce for a few moments. Defense counsel moved to, at least, disqualify Darce as a juror, and, preferably, for a mistrial. The prosecutor objected, arguing that Darce did not know Bowles and had no problem remaining as juror. She further argued that she saw no prejudice based on what Darce had said. Defense counsel replied that Darce knew the family well enough to say “hello,” and that Darce had said nothing about whether he could remain impartial and continue as a juror.
 

 After hearing arguments of counsel, the trial judge asked Darce to return to the court for additional questioning regarding his relationship with the Bowles’ family. Darce testified that, in 2001, he had moved into his father’s house after his divorce. Darce stated that he had talked to Bowles’ mother only once or twice in the six or seven years that he had lived on the street. Further, those conversations were after Hurricane Katrina and limited to safety and health issues. Darce said he never spoke to the Bowles’ children.
 

 When asked if this affected his feelings about sitting on the jury or changed how he viewed or approached this case, Darce replied that he could still be |lsobjective about “everything.” Defense counsel asked Darce whether living two doors down from the Bowles’ family would affect his thinking, and Darce answered, “I don’t owe them anything, so, I mean, I can be as honest and objective as I have to be.” After defense counsel completed his questioning of Darce, the prosecutor said she had no further questions. Darce then exited the courtroom.
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and die court is satisfied, that he can render an impartial verdict according to the law and the evidence;
 

 Although defense counsel did not doubt that Darce was sincere in what he was saying, he still maintained his objection to Darce continuing to serve on the jury. He said that if that information had been elicited during voir dire, that Darce would have been excused for cause. The trial judge then read La.C.Cr.P. art. 797(3) and stated that Darce had no friendship or relationship with the victims or the district attorney.
 
 [12]
 
 He also pointed out that article 797 did not mention exclusion of witnesses.
 

 The trial judge stated that Darce said he could be fair and that living two doors down from the Bowles’ family would not influence him. He noted that Darce did not know Bowles, but had talked to his mother once or twice in six or seven years. The trial judge said it was not reasonable to conclude that that would influence Darce in reaching a verdict. He stated that he thought Darce could judge the credibility of Bowles and that he could perform his oath. Based on those reasons, the trial judge denied the motion to disqualify Darce as a juror and the motion for
 
 *288
 
 a mistrial. Defense counsel noted his objection.
 

 
 *287
 
 (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict[.]
 

 
 *288
 
 Peremptory challenges shall be made before the swearing of the jury panel. La. C.Cr.P. art. 795 B(1). A juror cannot be challenged for cause by the State or | |flthe defendant after having been accepted by the challenging party, unless the ground for the challenge was not known by the challenging party prior to acceptance. La. C.Cr.P. art. 795. However, a challenge for cause must be made before the indictment is read to the jury.
 
 Id.
 
 If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course. La.C.Cr.P. art. 796. Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing then-duties. La.C.Cr.P. art. 789.
 

 The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased.
 
 State v. Williams,
 
 00-1134 (La.App. 5 Cir. 3/28/01), 783 So.2d 566, 567,
 
 citing, State v. Shelton,
 
 377 So.2d 96, 102 (La.1979).
 

 A juror’s disclosure during trial that the juror knows or is related to a witness or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict.
 
 State v. Holland,
 
 544 So.2d 461, 465 (La.App. 2 Cir.1989),
 
 writ denied,
 
 567 So.2d 93 (La.1990). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict.
 
 State v. Holland,
 
 544 So.2d at 465,
 
 citing, State v. Hodgeson,
 
 305 So.2d 421 (La.1974).
 

 In
 
 State v. Holland, supra,
 
 cited by the State in its brief, a juror sent a letter to the trial judge during the trial to inform him that he had just learned he was possibly related to the victim. The juror stated that, even if he was related to the victim, it would not affect him or the process of his decision making and he could be fair and impartial. Defendant challenged the juror for cause. The trial judge |2odenied the challenge and stated that there was nothing to make him conclude that any possible relationship would influence the juror in arriving at a verdict. Defendant objected to the ruling. On appeal, the Second Circuit said that it could not find that the trial judge erred in concluding that the possible relationship, of which the juror was unaware during voir dire, would not prejudice defendant or prevent a fair trial. As such, the Second Circuit found no abuse of the trial judge’s discretion in denying the challenge for cause.
 
 Id.,
 
 544 So.2d at 465-66.
 

 In the instant case, the record reflects that the juror did not know Bowles and did not realize that he lived two doors down from him until Bowles’ provided his address during his tidal testimony. He only talked to Bowles’ mother once or twice in six or seven years. Additionally, the juror said that, even though he lived near Bowles, he could still be honest and objective when viewing this case.
 

 In light of the foregoing, we find no error in the trial judge’s finding that it was unreasonable to conclude that this new information -would influence the juror in arriving at a verdict.
 
 Holland, supra; Hodgeson, supra.
 
 As such, we cannot say that trial judge abused his discretion by denying defendant’s motion to disqualify Darce from serving as a juror in this case.
 

 
 *289
 
 Finally, the record was reviewed for errors patent, according to La.C.Cr.P. art. 920. We have found no errors that require corrective action.
 

 AFFIRMED.
 

 [1]
 

 . Also, on August 15, 2008, the State filed a multiple offender bill of information alleging defendant to be a fourth felony offender, and defendant denied those allegations. The record before this Court does not reflect that the multiple offender adjudication hearing has been held.
 

 [2]
 

 . Sergeant Joseph Chaisson testified that, at 7:56 p.m. on January 3, 2007, a 911 call was received from “Gustavo.”
 

 [3]
 

 . Lynda Santopadre, the manager of Tastee Donuts, testified that a lock box was kept on top of the safe in the office in the kitchen.
 

 [4]
 

 . Tujaque testified that, while the robber was in the kitchen, he and the others in the restaurant ran out the front door.
 

 [5]
 

 . Bowles testified that he got $400.00 and defendant got $800.00. However, Santopa-dre, the manager, testified that her receipts show that approximately $1,600.00 was taken.
 

 [6]
 

 . "Hearsay” is a statement, other than one made by the declarant while testifying at the present trial, which is offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay evidence is not admissible except as otherwise specified in the Louisiana Code of Evidence or other legislation. La. C.E. art. 802. Although a statement may constitute inadmissible hearsay, if the statement is merely cumulative or corroborative of other evidence, the admission of the evidence is harmless error.
 
 State v. Hester,
 
 99-426 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 107.
 

 [7]
 

 . Defendant's trial counsel did not object at trial to the testimony that defendant attacks on appeal. In order to preserve the right to seek appellate review of an alleged trial court error, the party alleging the error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. La.C.Cr.P. art. 841;
 
 State v. Gaal,
 
 01-376 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949,
 
 writ denied,
 
 02-2335 (La.10/3/03), 855 So.2d 294. The purpose behind the contemporaneous objection rule is to pul the trial judge on notice of an alleged irregularity, allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant.
 
 Id.
 
 A defendant is limited on appeal to the objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal.
 
 State v. Taylor,
 
 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 594.
 

 [8]
 

 . See
 
 State
 
 v.
 
 Brooks, supra,
 
 where die supreme court did not find that counsel’s ' “no question defense” ' constituted ineffective assistance of counsel, even though it was unsuccessful.
 
 State v. Brooks, 505
 
 So.2d at 724.
 
 See also State v. Singleton,
 
 05-634, p. 13 (La.App. 5 Cir. 2/14/06), 923 So.2d 803, 811,
 
 writs denied,
 
 06-1208 (La.11/17/06), 942 So.2d 532 and 08-2386 (La.1/30/09), 999 So.2d 753, "The defense counsel decision not to object to the admission of Norman’s statement, at the suppression hearing, in order to use it to impeach him, at trial, is a tactic falling within the ambit of trial strategy, and does not establish ineffective assistance of counsel.”
 

 [9]
 

 .
 
 But compare State v. Matthews,
 
 450 So.2d 644, 647 (La.1984), "A jury may convict upon an accomplice’s uncorroborated testimony.”
 
 See also State v. Higginbotham,
 
 554 So.2d 1308, 1311 (La.App. 1 Cir.1989) and
 
 State v. Bonner,
 
 39,187, pp. 6-7 (La.App. 2 Cir. 12/22/04), 895 So.2d 1, 5-6,
 
 writ denied,
 
 06-1490 (La.3/9/07), 949 So.2d 435,
 
 citing, State v. Matthews, supra,
 
 for that proposition.
 

 [10]
 

 . Tujaque testified it was defendant's truck; however, Bowles testified that he was in his truck.
 

 [11]
 

 .
 
 See State v. Sehaffner, supra,
 
 where the supreme court found that the testimony of the accomplice was materially corroborated, in part, when the police observed defendant walking in the parking lot of the Burger King near the bank, corroborating the accomplice’s story that defendant planned to observe him leaving the bank while waiting at a restaurant.
 
 State v. Schaffner,
 
 398 So.2d at 1035.
 

 [12]
 

 . La.C.Cr.P. art. 797 provides, in pertinent part, that the State or the defendant may challenge a juror for cause on the ground that: