STATE OF LOUISIANA

VERSUS

JAVONTAE D. SIMMONS AKA "TAE"

NO. 18-KA-640

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 15-4164, DIVISION "M"
HONORABLE HENRY G. SULLIVAN, JR., JUDGE PRESIDING


October 09, 2019


**STEPHEN J. WINDHORST**
**JUDGE**


Panel composed of Judges Stephen J. Windhorst,
Hans J. Liljeberg, and Timothy S. Marcel, Pro Tempore


**CONVICTIONS AND SENTENCES AFFIRMED**
    **SJW**
    **HJL**
    **TSM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Paul D. Connick, Jr.
    Terry M. Boudreaux
    Thomas J. Butler
    Andrea F. Long
    Douglas W. Freese
    Lindsay L. Truhe

COUNSEL FOR DEFENDANT/APPELLANT,
JAVONTAE D. SIMMONS AKA "TAE"
    Mary Constance Hanes

**WINDHORST, J.**

Defendant, Javontae D. Simmons, a/k/a "Tae,"[1] appeals his convictions for second degree murder, conspiracy to commit second degree murder, and two counts of attempted second degree murder, asserting one assignment of error regarding the denial of his motion for mistrial after a juror revealed, on the third day of trial, that the State's expert witness had taught her forensic science at Loyola. Based on the following, we affirm.

**Facts and Procedural History**

After a jury trial, defendant was convicted of the second degree murder of Stacy Johnson Jr., in violation of La. R.S. 14:30.1 (count one), conspiracy to commit second degree murder, in violation of La. R.S. 14:26 and La. R.S. 14:30.1 (count two), and two counts of attempted second degree murder of Develle Washington and Robert Cooley, in violation of La. R.S. 14:27 and La. R.S. 14:30.1 (counts three and four). On May 14, 2018, defendant filed a motion for new trial and motion for post-verdict judgment of acquittal, both of which the trial court denied prior to sentencing.

The trial court sentenced defendant on count one to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence; on count two, to thirty years imprisonment at hard labor; and on each of counts three and four, to fifty years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The court further ordered the sentences to run concurrently with each other. The trial court denied defendant's motion to reconsider sentence and granted his motion for appeal.

On April 6, 2015, twenty-year-old Stacy Johnson Jr. was shot and killed outside a friend's residence in Harvey, Louisiana, in the early morning hours of April 7, 2015. At trial, Dr. Marianna Eserman testified that she performed the autopsy on

---

[1] There are discrepancies in the record regarding the spelling of defendant's name. In some places in the record defendant is referred to as "Jvontae Simmons" while at other places he is referred to as "Jvontae D. Simmons" or "Javontae D. Simmons" or "Javontae Simmons."

the victim who died, Stacy Johnson, Jr., and concluded that Mr. Johnson died as a result of gunshot wounds to his chest and right leg.

At the time of the shooting, the victim, Develle Washington and Robert Cooley were sitting in a Pontiac G6 in front of Robert Cooley's residence located at 3716 Clover Lane smoking marijuana when they heard gunshots shatter the car window where the victim was sitting. Detective William Roniger of the Jefferson Parish Sheriff's Office testified that the Pontiac G6 was struck by numerous rounds of ammunition on the passenger side of the vehicle, and that of the three men inside the vehicle, neither the victim, nor Robert were the intended targets of the shooting. He explained that the gunshots were fired randomly into the vehicle occupied by several people in which only one person was the intended target.

Sergeant Thomas Gai of the Jefferson Parish Sheriff's Office was the lead investigator assigned to Mr. Johnson's homicide. On April 7, 2015, approximately 12:45 a.m., Sergeant Gai arrived on the scene, where he observed Mr. Johnson's body lying several feet from the driver-side open door of a white vehicle parked in front of the residence. It was obvious to Sergeant Gai that the victim had been shot in the back. He also noticed several spent cartridge casings scattered in the front yard and driveway of the Cooley residence. Based on his on-scene investigation, including the different calibers of spent casings recovered, Sergeant Gai believed there were three shooters involved who were positioned at various locations throughout the front yard, shooting towards the white Pontiac.

According to Sergeant Gai, later in the day on April 7, 2019, JPSO received a telephone call from an anonymous source who told them a black male and a black female were in possession of the firearms used in Mr. Johnson's murder and that they intended on selling the weapons to someone at the Oakwood Mall. The source further advised Sergeant Gai of the specific weapons used in the commission of the murder and named "Tae" (Defendant), "Rasta" (Dorian Lonzo), and "Dae Dae"

(Dashawn Butler) as the individuals involved.[2] The source stated that defendant personally admitted to him that he "did the shooting."

Based on the anonymous tip discussed above, Detective Roniger and other officers recovered the murder weapons involved in the homicide during a stop of a vehicle occupied by Kirklon Boyd and Ashley Degree. Inside the vehicle, the officers recovered the 7.62 caliber rifle and the 9 mm Beretta handgun, both of which were used in the homicide. Boyd and Degree were detained and their cell phones seized. Linda Tran, a firearm and tool-mark identification expert, testified that three different semiautomatic weapons were fired at the scene of the homicide. Ms. Tran testified that two of the weapons were recovered from Boyd and Degree, including the 7.62 rifle and the 9 mm pistol. She confirmed that the 9 mm casings found at the scene were fired from the recovered 9 mm pistol and that the 7.62 caliber casings found at the scene were fired from the recovered rifle. Ms. Tran also determined that the five .40 caliber casings found at the scene were fired from the same 40 caliber weapon, although they did not recover that weapon.

Ashley Degree testified that on April 7, 2015, she received a phone call from Boyd who asked her to give him a ride to defendant's house and then to the mall. She testified that when they arrived at defendant's house, defendant came outside and gave a handgun to Boyd. Degree stated that Boyd informed her they were picking up murder weapons. Degree further testified that before proceeding to the mall, they made a second stop on Sandy Lane in Harvey, where Boyd got out of the car. Degree testified that she did not see if Boyd met with anyone at that location because she was on her phone. After the Sandy Lane stop, Degree drove Boyd to the mall where they were stopped by the police. Degree admitted that she knew the handgun Boyd received from defendant was in her car but denied knowing there was a second gun, the rifle, in her trunk.

---

[2] Sergeant Gai also testified that both Butler and Lonzo told him there were three shooters.

Text messages were extracted from Boyd's cell phone which established that an hour and a half before the shooting, Butler sent a text message to Boyd stating, "Let Tae [defendant] shoot the stick,"[3] to which Boyd replied, "I'm not shooting the sticks," prompting Butler to respond, "What?  You shooting Rasta's [Lonzo's] s**t 'cause I got the Retta [the 9 millimeter Beretta].  Better let Rasta [Lonzo] shoot that big b**ch."  Then, approximately one hour after the murder, the records evidenced that defendant called Boyd twice within a two-hour period, and two hours after the shooting, defendant sent a text message to Boyd indicating, according to Sergeant Gai, that he participated in the shooting because Develle "f**ked" with Boyd.  Later that day, defendant and his co-defendants exchanged text messages of love and gratitude for one another.

On the afternoon following the murder, and approximately three and a half hours prior to Boyd's arrest, defendant sent another text message to Boyd in response to Boyd's question as to his whereabouts, indicating that he was in Marrero.  Additionally, within a few hours of Boyd's arrest at Oakwood Mall, Boyd sent text messages to unidentified numbers in which he indicated that he was trying to get a ride to get rid of the guns.  Defendant and Boyd then called each other back and forth in the hour leading up to Boyd's arrest.  Boyd's cell phone records further established that Butler and Lonzo both contacted Boyd regarding the guns and referenced the other weapons he hoped to exchange for them.

Sergeant Gai testified that based on Boyd's cell phone records and the interviews he conducted, he was able to eliminate Boyd as one of the shooters and concluded that defendant, Dorian Lonzo, and Dashawn Butler were the three shooters involved in the homicide of Stacy.  Specifically, Boyd was on probation at the time and wearing a GPS ankle monitor, which excluded his presence at the scene.  In addition, cell phone records from the participants involved in the shooting were

---

[3] Sergeant Gai testified that in his experience "the stick" is a street term referring to a long gun or pistol.

"hitting on" a tower less than a mile from the scene of the murder at the relevant times.

Defendant was arrested the following day and agreed to provide a statement. Sergeant Gai testified that defendant ultimately gave three statements. At first defendant denied any knowledge of the victims or involvement in the murder but later admitted that he was present at the time of the shooting, however, only as a bystander. He then confessed that Boyd had "beef" with Develle. He stated that he, Boyd, "Dae Dae," and "Rasta" were out there that night, but that he never had a gun, asserting that it was the others who had the guns. During the second interview, Sergeant Gai drove defendant to Dorian Lonzo's ("Rasta") house on Clover Lane for identification, which was approximately five houses down from the murder scene and was a location defendant admitted to being at with "Rasta" and Dashawn Butler ("Dae Dae") on the night of the murder. Sergeant Gai testified that during one of the interviews, defendant explained that Develle and Boyd had "beef" with each other and that it was Boyd's idea to get rid of the guns used in the murder but confessed that Boyd was not one of the shooters. Defendant eventually told Sergeant Gai there were three shooters-himself, "Rasta," and "Dae Dae,"-and that they "did it" for their friend Boyd who had "beef" with Develle.[4] Defendant told Sergeant Gai that he shot a black pistol approximately five times. He further stated that "Rasta" shot the "long gun," and "Dae Dae" had the other pistol.

Warrants for Butler's and Lonzo's arrests were obtained and executed along with a search warrant for Boyd's cell phone. A forensic analysis of Boyd's cell phone established that approximately five to six hours before the shooting, defendant called Boyd twice and that Butler called Boyd once. Boyd's cell phone records

---

[4] Sergeant Gai testified that he believed, based on his interviews with defendant, the motive for the shooting was based on a prior confrontation between Boyd and Develle on Bourbon Street where Develle struck Boyd for "disrespecting" his sister.

further revealed that an hour and forty-five minutes prior to the shooting Lonzo called Boyd.

**Discussion**

In his only assignment of error, Defendant asserts that the trial court abused its discretion in denying his motion for mistrial after a juror revealed that the State's expert witness had taught her forensic science at Loyola. For the reasons that follow, we affirm defendant's convictions and sentences.

On the third day of trial, the bailiff informed the court that juror Jihye Lim had disclosed to him that she knew Chief Scanlan, one of the State's expert witnesses.[5] The State told the court that Chief Scanlan was not on the original witness list because it did not intend to call him; however, after certain questioning by defense counsel during trial, the State decided to call him as a witness. Based on this information, defendant moved for a mistrial. Before considering defendant's motion, the trial court called juror Lim to the bench for questioning. During the bench conference, juror Lim stated that Chief Scanlan had taught her forensic science at Loyola in 2014. Juror Lim stated that despite Chief Scanlan having been her professor at one time, she could "definitely" judge his credibility in the same way as she would any other witness. Juror Lim was then asked by defense counsel whether she would value his opinion over the opinion of someone else because she had taken his class. In response, she replied, "I don't think so."

After the bench conference, defendant again moved for a mistrial, stating that juror Lim's student-teacher relationship with one of the key witnesses in the case "would heighten the likelihood that she's going to take what he says seriously." Defendant further expressed that he would not have accepted her on the jury had he known of their relationship. The State responded, asserting that the mere fact that a juror knows a witness does not disqualify them from serving on the jury.

---

[5] Chief Scanlan testified on the same day juror Lim brought to the court's attention her connection to Chief Scanlan.

The trial court denied defendant's motion for mistrial, finding as follows:

THE COURT:

All right. We did have Ms. Lim come to the bench outside of the presence of the rest of the jury and question her with regard to whatever relationship she had with Tim Scanlan. The bailiff had reported to us that Ms. Lim told him and we appreciate the fact that she did that. She took that class with Tim Scanlan. She indicated to the Court that she took a class in forensic science where he was a professor in 2014. And the Court questioned her with regard to any personal relationship she had with Tim Scanlan. She said that there was none, that he simply was a professor who taught her a class that she took. Mr. Thomas asked a question of whether or not she would consider his opinion with more value or greater than any to the expert witness who would testify and she said "No." The Court does not find a basis for mistrial. It wasn't a witness that was hidden from the defense. It was witness who was not anticipated to be called at the beginning of the trial during the process of jury selection. Your motion for a mistrial is denied and your objection is noted for the record.

Defendant argues the trial court abused its discretion in denying his motion for mistrial because given the circumstances juror Lim lacked impartiality and he would not have accepted her during *voir dire* if he had known of the student-teacher relationship between her and Chief Scanlan. Defendant asserts that Chief Scanlan's testimony was elicited by the State in an attempt to disprove the defense's theory that there were only two shooters and that defendant was merely a bystander to the shooting. He further argues that the State relied heavily on the expert opinion of Chief Scanlan, and that without his testimony, the jury may not have accepted the State's "three shooter theory." Defendant notes the trial court did not have the option of replacing juror Lim with an alternate because the court had already used the only alternate it had to replace a different juror. He argues, as a result, that the trial court's only option was to grant his motion for mistrial due to juror Lim's alleged lack of impartiality.

In response, the State argues the trial court did not abuse its discretion in denying defendant's motion for mistrial in that the student-teacher relationship between this juror and the State's witness four or more years prior to trial did not disqualify the juror from serving. The State also asserts that defendant received a

trial by a jury composed of fair and unbiased individuals, specifically noting that juror Lim's responses during questioning on the issue show that her previous student-teacher relationship with Chief Scanlan did not influence her opinion or preclude her from arriving at a fair verdict.

Mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. State v. Clark, 02-1463 (La. 6/27/03), 851 So.2d 1055, 1079, cert. denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion. Id.[6]

The law requires that jurors be fair and unbiased, not that the jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. State v. Williams, 00-1134 (La. App. 5 Cir. 3/28/01), 783 So.2d 566, 567. A juror's disclosure during trial that the juror knows a witness or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. State v. Holland, 544 So.2d 461, 465 (La. App. 2 Cir. 1989), writ denied, 567 So.2d 93 (La. 1990). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. Holland, 544 So.2d at 465. A trial court has great discretion in ruling on the qualifications for a juror to serve, and its ruling should not be disturbed unless the reviewing court finds a clear abuse of this discretion. State v. Jones, 315 So.2d 650 (La. 1975).

---

[6] If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course. La. C.Cr.P. art. 796. However, after the first witness is sworn, La. C.Cr.P. art. 789 provides for the replacement of a juror with an alternate juror in the event a juror becomes unable to serve or is disqualified. State v. Derouselle, 99-3283 (La. 4/28/00), 761 So.2d 1269, 1270 (per curiam); State v. Fuller, 454 So.2d 119, 123 (La. 1984); State v. Gabriel, 542 So.2d 528, 533 (La. App. 5th Cir. 1989), writ denied, 558 So.2d 566 (La. 1990). Here, the trial court did not have the option of replacing juror Lim with an alternate juror because prior to the start of the trial testimony, the court used the one alternate juror to replace another juror who had childcare issues.

Louisiana appellate courts have found that replacement was not necessary when there was no showing that the juror could not be fair or impartial. In State v. Colbert, 07-0947 (La. App. 4 Cir. 7/23/08), 990 So.2d 76, writ denied, 08-2098 (La. 5/15/09), 8 So.3d 579, the juror indicated that her work occasionally brought her in contact with police officers who retrieved ballistics evidence from the hospital where she worked. However, she stated that she knew nothing about the case being tried and because she was not involved with any evidence retrieved from the emergency room where the victim had been taken, she would have had no contact with the evidence in this case. She further indicated the fact that she often came in contact with police officers would not make any difference to her with respect to the case. Accordingly, the fourth circuit determined there would have been no basis for the trial court to find that she was partial or could not be fair. Thus, the fourth circuit concluded the trial court properly denied the defendant's request to remove her and replace her with an alternate juror.

In State v. Stewart, 08-1265 (La. App. 5 Cir. 5/26/09), 15 So.3d 276, writ denied, 09-1407 (La. 3/5/10), 28 So.3d 1003, this Court found no abuse of discretion in the denial of a defendant's challenge for cause when a juror realized, after testimony began, that he lived two doors down from the defendant's accomplice who was an essential prosecution witness. Discussions with the juror revealed that he had only talked to the accomplice's mother once or twice and that even though he lived near the accomplice, he could still be honest and objective when viewing the case.

Considering the present facts and the foregoing jurisprudence, we find no abuse of discretion in the trial court's denial of defendant's motion for mistrial inasmuch as the teacher-student relationship between juror Lim and Chief Scanlan did not warrant the granting of a mistrial. The trial judge conducted an inquiry into their relationship and determined that juror Lim had no personal association with

Chief Scanlan but only knew Chief Scanlan as a former professor from a class she took in 2014. The trial judge noted that juror Lim assured him that she would not consider Chief Scanlan's opinion with more value than any other expert witness who would testify, and noted that Chief Scanlan was not a witness that was hidden from the defense as it was not anticipated that he would be called at trial. Accordingly, trial court did not abuse its discretion in denying defendant's motion for mistrial on the basis of the court's refusal to remove juror Lim after finding that this new information would not influence her in arriving at a verdict.

**Decree**

Based on the foregoing, we affirm defendant's convictions and sentences.

<u>**CONVICTIONS AND SENTENCES AFFIRMED**</u>

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

MARY E. LEGNON
INTERIM CLERK OF COURT

CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **OCTOBER 9, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
**MARY E. LEGNON**
INTERIM CLERK OF COURT

# 18-KA-640

## E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE HENRY G. SULLIVAN, JR. (DISTRICT JUDGE)
TERRY M. BOUDREAUX (APPELLEE)          ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

## MAILED

MARY CONSTANCE HANES (APPELLANT)       HON. PAUL D. CONNICK, JR. (APPELLEE)
ATTORNEY AT LAW                        DOUGLAS W. FREESE (APPELLEE)
LOUISIANA APPELLATE PROJECT            LINDSAY L. TRUHE (APPELLEE)
POST OFFICE BOX 4015                   ASSISTANT DISTRICT ATTORNEYS
NEW ORLEANS, LA 70178-4015             TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053