JOHNSON, J.
Defendant/Appellant, appeals his convictions and sentences for two counts of manslaughter from the 24th Judicial District Court, Division "J". For the following reasons, Defendant's convictions and sentences are affirmed.
FACTS AND PROCEDURAL HISTORY
On April 11, 2013, a Jefferson Parish Grand Jury indicted Defendant, Ernest L. Payne, Jr., and co-defendant, Jordan T. Hicks,[1] with two counts of second degree murder, violations of La. R.S. 14:30.1.[2] Defendant pleaded not guilty to the charged offenses at his arraignment on May 29, 2013. Following numerous continuances, trial commenced before a 12-person jury as to both Defendant and co-defendant Hicks on May 16, 2017.
Among the witnesses who testified at trial, Deputy Christopher Lewis of the
Jefferson Parish Sheriff's Office stated that, on August 12, 2012, he was patrolling the area surrounding LaPalco Boulevard and Betty Street in Marrero, as a block party was occurring that evening. At some point that evening, he became aware of a shooting in the area that occurred near the *1017 intersection of Julie Street and Second Zion Avenue. As he approached the intersection, Deputy Lewis observed a car riddled with bullet holes with two subjects inside. Deputy Lewis found two black males in the vehicle, both suffering from apparent gunshot wounds. The male in the passenger's seat appeared to be deceased, but the male in the driver's seat was still semi-conscious. He observed that the driver was armed with an "AK-47,"[3] and the passenger was armed with a Glock pistol, with his finger still on the trigger. Deputy Lewis removed the firearms from the vehicle and secured the scene. He then called for back-up to assist him and also called EMS. The passenger of the vehicle, later identified as Delanta McCall,[4] was declared dead on the scene; however, the driver of the vehicle, later identified as Martin Harry,[5] was transported to the hospital but was later declared deceased.[6] Deputy Lewis was advised by a witness that a white pick-up truck had sped away from the scene moments before he had arrived.
Kira Carter testified that she was living at 1634 Julie Street on August 12, 2012. On that evening, she was sitting outside on the front porch, with three of her friends, Conekia Phillips, Kevineka Clay, and Carrie Cosgrove, and their children, when the shooting occurred. Prior to the shooting, Ms. Carter had walked to her vehicle parked on the street to retrieve a diaper. As she was walking back to her porch, a man who had arrived in a white truck[7] approached her on foot and attempted to speak with her, but she did not pay much attention to him. She also witnessed two vehicles pull up near the stop sign on the corner by her home. Ms. Carter heard the people in the two vehicles exchange words with the others on the porch. She recounted that as she was walking back to the porch, she heard gunshots. Ms. Carter testified that the man who approached her was the driver of the white truck.
About a month after the shooting, Sergeant Travis Eserman, a detective with the Jefferson Parish Sheriff's Office, spoke with Ms. Carter about identifying the man who approached her. She was shown a photographic lineup but was unable to identify any one person with certainty. She did, however, narrow the field to either one of two subjects, one of which was Defendant.
Nakia Williams, a cousin of the victims, testified that he was with them on the day of the shooting, August 12, 2012. He explained he was in the backseat of the victims' car, Jacobee Goff-a friend of the victims-was in the car in front of them, and that they were just driving around. He testified that at the stop sign located at the intersection of Second Zion and Julie, Mr. Goff had rolled down his window, and "asked for Lil Kevin" to a group of women *1018 sitting on a porch. Mr. Williams described that after that, he heard gunshots. He stated that Mr. Harry tried to drive away but Mr. Goff's car was blocking them. Mr. Williams testified that he saw someone approaching the driver's side of the car and shooting at the car on an angle from the driver's side. He testified that he also saw Defendant standing next to his white truck, with others shooting from the back of the truck. Mr. Williams indicated that he was ducking in the backseat to avoid gunfire, but then exited the vehicle and ran toward his aunt's house on the next street. Later, when he spoke with detectives, Mr. Williams identified co-defendant Hicks in a photographic lineup as someone he recognized at the scene, "[r]unning around the...driver's side of the vehicle." He also identified Defendant as someone he saw on the scene near the truck.
At the conclusion of the trial, on May 19, 2017, Defendant was found guilty of the responsive verdicts of manslaughter on each of the two counts.[8] On June 6, 2017, the State filed a habitual offender bill of information on count one, alleging Defendant to be a second felony offender.
On June 7, 2017, Defendant filed a motion for new trial and motion for post-verdict judgment of acquittal, which were denied that day in open court. After delays were waived, the trial court sentenced Defendant to 40 years imprisonment with the Department of Corrections[9] on each count to run concurrently with one another.
A hearing on the habitual offender bill of information was held on August 21, 2017. After finding Defendant to be a second felony offender, the trial court vacated its previously imposed sentence on count one and resentenced Defendant, pursuant to La. R.S. 15:529.1, to 70 years with the Department of Corrections without the benefit of probation or suspension of sentence, to run concurrently with his sentence on count two.
On August 23, 2017, Defendant filed a motion to reconsider sentence and a motion for appeal. The trial court denied the motion to reconsider sentence and granted Defendant's motion for appeal on August 28, 2017. The instant appeal followed.
ASSIGNMENT OF ERROR
On appeal, Defendant alleges the trial court erred by admitting the statement of an unidentified out-of-court deponent into evidence over the objections of defense counsel.
LAW AND ANALYSIS
In his sole assignment of error, Defendant argues that the 9-1-1 call contained objectionable hearsay. He contends that an out-of-court statement made within the call was made in response to police dispatcher interrogation regarding the identity of the alleged perpetrator after the incident had concluded; as such, it is testimonial and should not have been admitted into evidence. He avers that its introduction into evidence over objection at trial was contrary to his Sixth Amendment right to confrontation and Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and was not harmless error. Defendant further argues that even if the admission of the 9-1-1 call did not violate the Confrontation Clause, the calls were still inadmissible under the *1019 hearsay rules, specifically La. C.E. art. 801(C). He argues that the call was inadmissible hearsay and should not have been admitted into evidence under the excited utterance exception under La. C.E. art. 803(2).
The State responds that Defendant complains in part that the introduced 9-1-1 calls-three total-constituted inadmissible hearsay; however, the State points out that when the calls were admitted into evidence at trial, defense counsel only objected based on "the Crawford case" and made no objection regarding a violation of hearsay rules. As a result, the trial court only ruled upon whether the 9-1-1 calls violated the Confrontation Clause, not whether they violated the Code of Evidence rules. As such, the State contends that any claim made on appeal that the calls were inadmissible hearsay is waived.
The State continues to argue that under the circumstances of the instant case, the statements made in the 9-1-1 calls were nontestimonial in nature because the circumstances objectively indicated that they were given to assist police officers in responding to an ongoing emergency. The State maintains that the questions posed by the 9-1-1 operator were necessary to evaluate the situation, locate potential perpetrators, and dispatch the required assistance. The State avers that, because the primary purpose of the callers' statements and the questioning by the 9-1-1 operator was to address and resolve an ongoing emergency, Defendant's constitutional rights under the Confrontation Clause were not violated. Nevertheless, the State concludes that even if the calls were improperly admitted, claims of error under the Confrontation Clause are subject to a harmless error analysis. The State notes that Defendant was concerned about the 9-1-1 caller stating a "white truck" had just left the scene because Defendant has a white truck. However, the State asserts that the contents of the call describing a white truck fleeing the scene is cumulative to other evidence at trial, thus any erroneous admission of the calls is harmless.
During the testimony of Nancy Webber with the Jefferson Parish Sheriff's Office 9-1-1 Center, the State moved to introduce and publish State's Exhibit 2, a CD containing the three 9-1-1 calls in this case. At that point, defense counsel objected "on the grounds of hearsay under the Crawford[10] case." The record reflects a bench conference was held. During the conference, the State responded that "[w]hen it is in the course of an ongoing emergency State versus Washington said that there is no confrontation. It's not testimony. So you don't have a Crawford issue." Defense counsel responded that the calls were being offered for the truth of the matter asserted, and the problem was that the person who made the statement "that the subjects are fleeing in a white truck" was unavailable, which was not allowed by Crawford . Defense counsel argued that, unlike the ongoing emergency exception asserted by the State, the instant case involved a scenario "after the shots are over with and you are talking about someone fleeing the scene and giving a description," which he argued was clearly hearsay unless the person who made the 9-1-1 call was present.
In the second[11] of the three 9-1-1 calls, the unidentified caller reported the need *1020 for assistance from police and that both of the victims had been shot in the head. After assuring that help was on the way, the 9-1-1 dispatcher asked, "could you tell me who shot 'em?" The caller responded, "we don't know. It was a white truck. They went up Julie Street. They made a left. A white pickup truck. Somebody was in the back of it laying down. They made a left."
The record reflects the trial court listened to all three of the 9-1-1 calls and remarked:
the first one clearly seems to be immediately during or after the voices are clearly frazzled and the level of excitement is obviously very high based upon the call.
The second call is from someone else who was more calm. It is difficult to tell whether that it is in as close in time proximity to the other call. It appears to be based upon the printout that it happened at the same time, right? The call came in at the same time.[12]
The record reflects that the State indicated that based upon the report, the first call was at 19:25:22, and the second call was two minutes later at 19:27:45. The third call was not made until 21:26:14. The State clarified that the third call was clearly outside the course of the ongoing emergency but noted that it was exculpatory and could not be excluded.
After the bench conference ended, the trial court ruled that:
For purposes of the record, just so the Court's ruling is clear. That the State [h]as offered 911 calls taken at the time of or shortly after the incident in question.
* * *
Based upon the timing of the events, the nature of the calls the Court does not believe it presents a Crawford issue given that it is either at the time of or immediately after that, if it is in fact after the incident involved, so the Court is going to allow those calls over the objection of Defense Counsel.
Additionally, in Defendant's motion for new trial, he reasserted that the court erred in allowing the State to play the 9-1-1 recording in which an unavailable witness stated that "the gunmen who committed the homicide escaped in a white pickup truck." He reiterated that the unidentified caller was not reporting the shooting as it was happening; rather, the call was several minutes after the shooting and was testimonial hearsay containing a description of Defendant's white pick-up truck fleeing from the scene. At the hearing on the motion, defense counsel further argued that the admission of the call violated Defendant's right to confront his accusers, which included an unknown caller linking Defendant to the homicide by stating his truck fled the scene.
The trial court, in denying the motion, reasoned:
there were a number of witnesses, those that identified and those identified by the Court that spoke of a white truck and Mr. Payne's involvement in bringing or transporting the other defendant and the other alleged persons involved in this particular incident to the scene of the crime. It was simply not the 911 call to the extent that there was any error in *1021 allowing that call in which I don't believe that there was because I do believe it formed part of the initial incident. However, to the extent there was an error in allowing that call in there was certainly ample other testimony from other witnesses who basically said the same thing. The white truck was present. Some identified it as Mr. Payne's truck, some identified it as Mr. Payne driving the truck. So there was clearly evidence other than that one single 911 call, so that motion is denied as well.
On appeal, Defendant argues that the 9-1-1 call should not have been admitted into evidence because the substance of the call was testimonial in nature and, therefore, violated his rights under the Confrontation Clause of the Sixth Amendment to confront witnesses against him. The United States Supreme Court has held that this guarantee, which is extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses. Cruz v. New York , 481 U.S. 186, 189, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). The Confrontation Clause bars the admission of an out-of-court "testimonial" statement against a criminal defendant unless the declarant is unavailable,[13] and the defendant had a proper opportunity to cross-examine the declarant. Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ; Davis v. Washington , 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
In support of this argument, Defendant relies on the United States Supreme Court's decision in Crawford v. Washington , supra , wherein the Court held that the admission of a recorded statement given to police by the defendant's wife violated the defendant's right under the Confrontation Clause because the statement was hearsay, because it was testimonial in nature, and because his wife did not testify at trial due to the State's marital privilege. Most significantly, because his wife did not testify at trial, the defendant had no other opportunity to cross-examine her. The Court specifically declined to define the term "testimonial," stating only that "[w]hatever else the term covers, it implies at a minimum to...police interrogation." Crawford , 541 U.S. at 68, 124 S.Ct. 1354.
The Supreme Court later elaborated on the meaning of testimonial statements in connection with the Sixth Amendment's Confrontation Clause in Davis v. Washington , supra -a case dealing specifically with the admission of statements made during a 9-1-1 call. In Davis , the victim called 9-1-1 to report a domestic altercation with her ex-boyfriend. Id. , 547 U.S. at 817, 126 S.Ct. 2266. During the call, the victim identified the defendant as her attacker and described the specifics of the ongoing assault in response to questions by the 9-1-1 operator. Id. , 547 U.S. at 817-18, 126 S.Ct. 2266. The trial court allowed the recording of the 9-1-1 call to be admitted into evidence despite the fact that the victim did not testify at trial. Id. , 547 U.S. at 822, 126 S.Ct. 2266. In finding the recordings to be nontestimonial in nature, and therefore admissible, the Supreme Court explained:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating *1022 that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id.
The Court reasoned that the statements were nontestimonial because "[a] 911 call...at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." Davis , 547 U.S. at 826, 126 S.Ct. 2266. The Court noted that the victim was "speaking about events as they were actually happening, rather than 'describ[ing] past events' " and that "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger, [the victim's] call was plainly a call for help against bona fide physical threat." Id. , 547 U.S. at 827, 126 S.Ct. 2266. The Court also reasoned that the nature of the questions posed by the 9-1-1 operator indicated that the purpose of the interrogation was to "resolve the present emergency, rather than simply to learn ...what had happened in the past." Id. Finally, the Court reasoned that the fact that the victim's answers were frantic and provided over the phone, in an environment that was not tranquil or even safe, indicated that the statements were nontestimonial. Id.
Finally, in State v. Norah , 12-1194 (La. App. 4 Cir. 12/11/13), 131 So.3d 172, writs denied , 14-0084 (La. 6/13/14), 140 So.3d 1188 and 14-0082 (La. 6/20/14), 141 So.3d 287, the Louisiana Fourth Circuit noted that in Michigan v. Bryant , 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the Court provided a framework to assist lower courts in determining whether a statement qualifies as testimonial. The Bryant Court emphasized that "the relevant inquiry is...the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id. , 562 U.S. at 360, 131 S.Ct. 1143. The Court then set forth a three-part inquiry.
Our inquiry must first began with determining whether there was an ongoing emergency. The existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation. Id. , 562 U.S. at 361, 131 S.Ct. 1143. This is a "highly context-dependent inquiry." Id. , 562 U.S. at 363, 131 S.Ct. 1143. Crimes, such as aggravated assault and murder, have much broader "zones of danger" which can extend to the public-at-large and the police. See Norah , 131 So.3d at 187 (citing Bryant , 562 U.S. at 363, 131 S.Ct. 1143 ). The scope and duration of an ongoing emergency can also fluctuate based on consideration of a number of factors, including the type of weapon used in the crime and the extent and nature of the victim's injuries. In Bryant , the Court found that the police were objectively reasonable in perceiving the situation as an ongoing emergency with possible significant danger to the public and themselves. See Bryant , 562 U.S. at 363-64, 131 S.Ct. 1143. The existence vel non of an ongoing emergency, however, is not dispositive of whether a statement is testimonial. See id. , 562 U.S. at 366, 131 S.Ct. 1143.
Second, courts should consider the formality of the interrogation. See id. , 562 U.S. at 366, 131 S.Ct. 1143. More formal interrogations are generally indicative of non-emergency situations and "testimonial" statements being given. Id.
*1023 Third, courts should determine the "primary purpose" of the interrogation through examining the statements and actions of both the declarant and the interrogator. See Bryant , 562 U.S. at 367, 131 S.Ct. 1143. This inquiry examines both parties as reasonable actors in their actual circumstances, including the severity of the victim's injuries. Id. For example, in Bryant , when the police approached the victim, they simply asked, "[w]hat happened?" This question, along with the victim's response providing the factual background of the shooting as well as the identity of his shooter, were objectively reasonable in the context of that ongoing emergency. See id. , 562 U.S. at 376, 131 S.Ct. 1143.
In this matter, the situation surrounding the shooting qualifies as an "ongoing emergency." A shooting is a crime that, by its nature, the police can objectively assume carries one of the greatest risks to the victim, the public, and themselves in responding to the incident. In this case, two men were shot in public with no indication to the police that the shooter(s) had surrendered. The police also had no knowledge of the whereabouts or the motive of the shooter(s). It was objectively reasonable for the police to treat this situation as an ongoing emergency. The instant factual scenario is similar to what occurred in Bryant -a man was shot, a shooter was at-large with a gun, and the injuries to the victim were serious. See id. , 562 U.S. at 375, 131 S.Ct. 1143.
Next, the questioning during the 9-1-1 call was informal. Similar to Bryant , the questioning occurred in the immediate aftermath of a shooting and prior to the arrival of emergency medical services or the police. See Bryant , 562 U.S. at 376, 131 S.Ct. 1143. The questions asked by the operator related to the well-being and location of the victims as well as the whereabouts and identity of the shooter(s). The first two calls to 9-1-1 were made while there was still potential danger to the victims and bystanders that the perpetrator(s) could return to the scene.
Furthermore, the 9-1-1 operator's questions were objectively reasonable as part of the police's response to this ongoing emergency-asking callers about the whereabouts of the shooter(s) is an objectively reasonable question. In addition, the caller's response of providing the factual background of the shootings was reasonable to enable police assistance to meet an ongoing emergency.
Based upon the foregoing facts, we find that the statements contained in the recording of the 9-1-1 calls were non-testimonial and, therefore, were not a violation under Crawford ; thus, the statements did not violate Defendant's constitutional right to confront his accuser.
Nevertheless, a violation of a defendant's right to confrontation is subject to a harmless error analysis. State v. Placide , 11-1061 (La. App. 5 Cir. 6/28/12), 109 So.3d 394, 399-400 ; State v. Merwin , 07-807 (La. App. 5 Cir. 4/15/08), 984 So.2d 842, 846. An error is harmless when the guilty verdict was surely not attributable to the error. Whether an error is harmless in a particular case depends upon many factors, including the following: (1) the importance of the witness' testimony; (2) whether the testimony was cumulative in nature; (3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; (4) the extent of cross-examination permitted; and (5) the overall strength of the State's case. Id. at 846.
The description of a white pickup truck as the suspect's vehicle that was provided in the 9-1-1 call was cumulative to other evidence at trial. A number of witnesses identified a white truck at the scene. For example, Deputy Lewis testified that he was advised by a witness that *1024 a white pick-up truck had sped away from the scene moments before he had arrived on the scene. Additionally, Mr. Williams testified he saw Defendant standing next to his white truck during the shooting. Ms. Carter and Ms. Clay indicated they saw a white truck at the scene. Further, during his second statement, Defendant indicated that he and his white truck were on Julie Street at the time of the shooting. Based upon the foregoing, we find that any error the trial court may have committed admitting the 9-1-1 call into evidence was harmless.
Errors Patent Discussion
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5th Cir. 1990). No errors that require corrective action were found.
DECREE
For the foregoing reasons, Defendant's sentences and convictions are affirmed.
AFFIRMED

Co-defendant Jordan T. Hicks has also appealed his convictions and sentences under companion case number 17-KA-419.

The indictment was amended on the same date to add Defendant to the second degree murder charge in count two.

As indicated in the ballistics expert's testimony, the weapon was actually a Century Arms 762 rifle.

Delanta McCall was referred to by his nickname, "Dig."

Martin Harry was referred to by his nickname, "Marty."

Dr. Susan Garcia performed the autopsies of the victims. She classified the manner of death as homicides, and the cause of death from gunshot wounds for both victims. She also classified the gunshot wounds they received as distant, meaning from more than three feet away. She further explained that Mr. McCall sustained a single gunshot wound to his head, whereas Mr. Harry sustained two gunshot wounds-one to his head and another to his neck.

Ms. Clay similarly indicated during her testimony that she saw a white truck with young men dressed in white shirts pass in front of her house that day.

Co-defendant Hicks was found guilty as charged on both counts.

This Court has previously held that when a trial judge states that the defendant is sentenced to the "Department of Corrections," the sentence is necessarily at hard labor. State v. Jamison , 17-49 (La. App. 5 Cir. 5/17/17), 222 So.3d 908, 909 n.2.

Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

At trial, even though defense counsel objected to the introduction of all three of the calls, he seemed to argue mostly regarding the second call. On appeal, Defendant only briefed argument regarding the second of the three calls.

In the first of the three calls, the unidentified caller expressed the need for police, provided the address for the scene, and informed the 9-1-1 operator that there were two dead bodies. After repeatedly telling the caller to calm down, the 9-1-1 operator asked, "who shot 'em" and "did you see who shot 'em;" however, the caller responded negatively. In the third call, the unidentified caller advised that the "person who did that...double homicide today in Marrero...was Arty White."

Sergeant Eserman testified that he tried to contact all the 9-1-1 callers from the 9-1-1 caller printout. He testified that he was able to call the number that made the second call; however, the person who answered "advised that they did not want to speak to the police and please not call them back." He testified that one of the callers was Ms. Philips, whom he spoke to and who later testified at trial; however, she stated she did not witness the shooting. He further advised that the number who made the "Arty call" called from an "un-serviced phone." Defendant did not object to the unavailability of the declarant.