STATE OF LOUISIANA

VERSUS

AHKEMON J BARDELL

NO. 23-KA-55

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 17,322, DIVISION "C"
HONORABLE J. STERLING SNOWDY, JUDGE PRESIDING

November 15, 2023

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Marc E. Johnson

**AFFIRMED**
 **JGG**
 **SMC**
 **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Bridget A. Dinvaut
    Orenthal J. Jasmin

COUNSEL FOR DEFENDANT/APPELLANT,
AHKEMON JACOB BARDELL
    Gwendolyn K. Brown

**GRAVOIS, J.**

Defendant, Ahkemon Jacob Bardell, Jr., appeals his conviction as charged as a principal to second degree murder, in violation of La. R.S. 14:30.1 and La. R.S. 14:24. On appeal, he asserts three assignments of error:

1. The trial court erred by allowing the State to admit evidence in violation of Mr. Bardell's constitutional right to confront the witnesses against him.

2. The trial court erred by denying Mr. Bardell's motion for a new trial predicated upon the denial of the defense's right to confrontation.

3. The trial court erred by denying Mr. Bardell's request to remove and replace a juror with an alternate juror after it became known that the subject juror was a friend of one of the State's primary witnesses.

After thorough review of the briefs and the entire record, we find no merit to the assignments of error and accordingly affirm defendant's conviction and sentence.

## PROCEDURAL HISTORY

On October 25, 2017, a St. John the Baptist Parish Grand Jury indicted defendant, Ahkemon Jacob Bardell, Jr., as a principal to second degree murder, in violation of La. R.S. 14:30.1 and La. R.S. 14:24. Branden A. Clegg, Domanique Barnes, and Malcom Muse were also indicted as principals to second degree murder in counts two, three, and four of the bill of indictment, respectively.

Defendant was arraigned on November 29, 2017 and pled not guilty. On March 15, 2022, the case proceeded to trial before a twelve-person jury, and on March 17, 2022, the jury unanimously found defendant guilty as charged. On June 23, 2022, defendant filed a motion for a new trial that was denied after a hearing on that same date. Following the denial of the motion for a new trial, defendant waived sentencing delays and the trial court sentenced defendant to life imprisonment in the Department of Corrections without the benefit of parole, probation, or suspension of sentence. Defense counsel thereafter filed a notice of appeal that was granted that same day.

## FACTS

Detective Brandon Barlow of the St. John the Baptist Parish Sheriff's Office testified that on February 15, 2017, the Sheriff's Office received a 9-1-1 call from Dagena Lumar, who advised that when she did not hear from her boyfriend, Andrew Jasmine, she asked her sister to check on him at his residence at 2000 East Frisco Drive in Laplace, Louisiana. Ms. Lumar stated that her sister subsequently checked on Mr. Jasmine at his residence and found his body, which had begun decomposing.

Ms. Lumar testified that the victim was a long-time friend from school and that in February of 2017, they were in a relationship. On February 13, 2017, she went to the victim's house, cleaned it, and left after 10:00 p.m. Ms. Lumar testified that she spoke to the victim on Facetime when she got home that night at approximately 10:30 p.m. While she was speaking to the victim, she heard a male voice in the background, but did not know whose voice it was. Ms. Lumar stated that the next day, she called the victim all day but got no answer. She further stated that she asked her sister to go and see if the victim was home. Ms. Lumar acknowledged that her sister found the victim. When asked if the victim had any security measures at his house, Ms. Lumar said that the victim had a deadbolt on his bedroom door and kept a gun between his mattress and the wall. Ms. Lumar recalled that when she left the victim's house on February 13, 2017, the victim had a stack of money on his television stand.

Detective Barlow testified that he went to the scene, where he observed the victim in a bedroom face up with his upper torso on the bed and his lower torso hanging from the bed. There was a pillow over the victim's head, the victim's pants were pulled down, and his pockets were pulled out. Detective Barlow recalled that the bedroom was in disarray, while the rest of the house was clean.

He further recalled that two different types of casings were recovered – six .380 caliber and one 9 mm.[1]

Detective Barlow testified that his office reviewed their computer system to determine whether there had been any gunshots reported nearby. Two days prior to the discovery of the victim's body, on February 13, 2017, Detective Barlow found that there were two 9-1-1 calls that were made at approximately 10:50 p.m. in that area. The callers reported that they heard gunshots in the area, saw a vehicle pull up, and observed three males exit the vehicle and go into the house, after which they noticed four black males later exit the house, get into a four-door black vehicle, and flee.[2]

Detective Barlow testified that his office later obtained the victim's cell phone records. Those records reflected that on February 13, 2017, between 10:00 p.m. and 11:00 p.m., several calls were made from a certain phone number to the victim's phone. Detective Barlow testified that when they entered that phone number into the Facebook search bar, they obtained the name of Ahkemon Bardell, defendant. He further testified that when they Googled defendant's name, they learned that defendant had been previously arrested in connection with an incident in Kenner wherein a group of individuals planned a drug "rip" of a person, which led to a murder.

Detective Barlow testified that his office also retrieved a surveillance video from 1721 East Frisco Drive, which he explained was across the street from the

---

[1] St. John the Baptist Parish Sheriff's Office Lieutenant Staty Lewis testified that he was a crime scene technician and that he processed the crime scene on February 15, 2017. He further testified that crime scene technicians took photographs, marked items, collected evidence including casings, and took a video of the crime scene. He stated that there were no signs of forced entry.

[2] Jessica Abbate testified that she was employed by the St. John the Baptist Parish Sheriff's Office as the custodian of records for 9-1-1 calls. She identified State's Exhibit 1 as a disc with two 9-1-1 calls made on February 13, 2017, at 10:51:55 and 10:52:59, respectively. *See* Assignments of Error Numbers One and Two for a more thorough discussion of the two 9-1-1 calls.

victim's residence approximately six or seven houses down. The video, which was dated February 13, 2017, showed a black Chevy Impala coming into view, traveling southbound away from the victim's house at 10:36 p.m., and parking directly across the street from 1703 East Frisco Drive. Detective Barlow also stated that the vehicle was in that position until approximately 10:50 p.m., when the lights turned on, the tail lights illuminated, and the vehicle sped down the street toward the victim's house.

Detective Barlow testified that he also looked at crime camera footage, where he saw the same vehicle later go through several intersections toward I-10. He noticed that the vehicle had a Texas license plate and that it was traveling eastbound towards New Orleans at approximately 11:00 p.m. Detective Barlow learned that the vehicle was registered to Haley Tillis, who had sold it to Domanique Barnes. He affirmed that they spoke on the phone with Barnes, who said he would talk to them if they would come to Houston; however, once they got to Houston, Barnes was not there. Detective Barlow testified that they located the vehicle in Houston and later learned that Barnes had sold the vehicle right after they told Barnes they were going to Houston to speak to him.

Detective Barlow testified that his office also obtained defendant's cell phone records. He stated that defendant and the victim spoke numerous times in the days prior to the homicide, but afterwards, there was no contact ever again. Detective Barlow further testified that the last call from defendant to the victim was on February 13, 2017, at 10:32 p.m., and at that time, defendant's phone was approximately eighty-two feet from the victim's residence. He stated that there was no activity on defendant's phone between 10:33 p.m. and 10:50 p.m. that night. He asserted that at 10:50 p.m., defendant made one call to the Houston cell phone number of Branden Clegg.

Detective Barlow testified that his office also obtained the phone records of Barnes, Clegg, and Malcom Muse, which he said showed that they traveled from the Houston area to the LaPlace area close to the victim's residence on February 13, 2017, at the time of the homicide, and then left. He stated that this coincided with the camera footage that photographed the vehicle as it was traveling. Detective Barlow pointed out that the only person who made contact with the victim by phone was defendant. He stated that the GPS locations in the phone records showed that defendant's phone was at the victim's house at the time of the homicide.

Detective Barlow testified that defendant subsequently voluntarily came to the detective bureau and gave a statement. In his statement, defendant said that he met up with the three other men (Barnes, Clegg, and Muse) to go and buy "lean" from the victim.[3] He stated that they went to the victim's house and he (defendant) went in first. Defendant stated that he bought "lean" from the victim and told the victim that he had other people who also wanted to buy some. He further asserted that the men texted him wondering why he was in the house so long. Defendant stated that he told the men that they could come inside. He also stated that the men came in and they all pulled guns, except for Clegg and himself, and shot the victim. Defendant explained that the other men ransacked the house and took the victim's phone. He noted that the victim also had a gun and had been on Instagram flashing money. Defendant claimed that there was only $800 to $1,000 in the house. He said that after the victim was killed, they left the house. Defendant admitted that they threw the victim's gun in the river.

Branden Clegg testified at trial that he was convicted of theft in 2013 and was still awaiting trial in the instant case for the charge of principal to second

---

[3] The record indicates that "lean" was a type of syrup with codeine in it.

degree murder. He further testified that the State had not made any promises or offered any deals to him in exchange for his testimony. Clegg asserted that defendant called him about marijuana and asked him to come to the New Orleans area. He maintained that on February 13, 2017, he drove Barnes' black Impala from Houston to the New Orleans area with Barnes and Muse and that they arrived between 9:00 p.m. and 10:00 p.m.

Clegg testified that when they arrived in Louisiana, they went to his grandmother's house. He then called defendant, after which defendant came over. Clegg explained that when they were talking about marijuana, defendant had wanted to "hit a lick," which he explained meant rob someone. He stated that defendant told him he had a "lick" on some "dude" and showed them an Instagram video of someone, later identified as the victim, counting money. He also stated that defendant told them where the victim lived and that the victim had "lean."

Clegg testified that they decided they would rob the victim. He said that defendant asked him for gloves and they left afterwards. He further testified that they got into the black Impala and went to where the victim lived. Clegg asserted that defendant called the victim, they dropped defendant off at the victim's house, and defendant went inside. He explained that the plan was for defendant to go inside the house, call them once he did so, and they would then go in. He stated defendant's plan if the victim resisted was that defendant was going to "handle business" and "get the job done."

Clegg maintained that they went there to rob the victim and no one went there to buy "lean." Clegg testified that when defendant went into the house, he (Clegg), Barnes, and Muse stayed in the vehicle. He admitted that all four of them had guns that night. He recalled that they backed up the vehicle a couple of houses down and waited for defendant. He further recalled that defendant later called, they pulled up to the house, and Barnes and Muse exited the vehicle and went into

the house. Clegg testified that approximately five minutes later, he got out of the vehicle, walked to the front door, and called for them to come out because he thought it was taking too long. He stated that defendant, Barnes, and Muse then came out of the house, got into the vehicle, and they left LaPlace. Clegg provided that Barnes, Muse, and defendant took approximately $1,000 to $2,000, two necklaces, and a pair of shoes from the house. When they got in the car, Barnes had the money, Muse had the shoes, and defendant had the necklaces.

Clegg testified that they divided the money and defendant gave him and Muse the necklaces. He believed Barnes, Muse, and defendant took the victim's phone and threw it out the window while they were on the bridge driving to New Orleans. Clegg maintained that Barnes, Muse, and defendant had firearms with them. He asserted that defendant had a Glock 42, which he explained was a .380 caliber gun. He also asserted that Barnes had a Glock 19, which he explained was a .9 mm. gun. Clegg recalled that they were angry about not seeing the money at the victim's house that they had seen on the Instagram video. Clegg testified that when they got back in the car, they told him they "laid him down" and "did the armed robbery."

Clegg stated a couple of days later, defendant told him that he went back to the house because he thought he had dropped something. He asserted defendant also told him that he had shot the victim. Clegg acknowledged he gave two statements to the police, and that in the first statement, he did not tell them what he testified to. He maintained that he only told the police "bits and pieces" at first because he wanted to protect himself and his family's safety. He stated that in the second statement, he told the police everything. However, Clegg admitted that in his second statement, he told the police he was dropped off at the corner.

Dr. Samantha Huber, who was accepted as an expert in the field of forensic pathology, testified that she was employed by the Orleans Parish Coroner's Office

as the chief forensic pathologist. She performed the autopsy on the victim and that the date and time of death was February 15, 2017, at 9:34 a.m., which she explained was when the body was found and someone pronounced the death. She also provided that the date of the autopsy was February 16, 2017 and the body was in the early stages of decomposition. Dr. Huber testified that the cause of death was multiple gunshot wounds and the manner of death was homicide. She explained that the victim sustained ten gunshot wounds and had significant damage to his body.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO

In these assignments, defendant argues that the trial court erred by allowing the State to admit evidence in violation of Mr. Bardell's constitutional right to confront the witnesses against him, and further that the trial court erred by denying the motion for a new trial predicated upon the denial of the defense's right to confrontation.[4]

Defendant argues that the trial court erred by permitting the State to introduce evidence of the content of the 9-1-1 calls, as well as the content of an interview with one of the 9-1-1 callers, in violation of defendant's right to confront his accusers. Defendant acknowledges that the Confrontation Clause only requires that a defendant be allowed to confront those witnesses who provide testimonial statements, and that in certain instances, 9-1-1 calls do not meet that test. However, defendant contends that in the instant case, one of the 9-1-1 calls relayed a report, not of what the caller was presently witnessing, but what his wife had told him she had observed.

Defendant asserts that under such circumstances, the content of this 9-1-1 call would not have the same indicia of reliability that would allow it to be

---

[4] The assignments are addressed together because they are related and because defendant addresses them together in his brief.

23-KA-55                                    8

admitted without providing defendant the opportunity to confront and cross-examine the caller. Defendant also asserts that an interview that the police had with one of the 9-1-1 callers subsequent to the call would clearly meet the definition of a testimonial statement. Defendant argues that in a case such as this in which the accuracy of the statement was critical to the State's theory of the case, it was critical that defendant have the opportunity to confront and cross-examine his accusers. Thus, defendant maintains that the trial court erred by denying his motion for a new trial based upon the erroneous admission of this evidence.

The State responds that the trial court's ruling was proper. It asserts that in *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224, 237 (2006), the Supreme Court found that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." The State argues that in the instant case, there was an emergency, as Mrs. Michelle Keller heard gunshots in her neighborhood prompting her husband's 9-1-1 call. It further argues that Mrs. Keller's husband's immediate call was for the intended purpose of enabling police assistance to meet an ongoing emergency.

The record reflects that Ms. Abbate testified at trial that she was employed by the St. John the Baptist Parish Sheriff's Office as the custodian of records for 9-1-1 calls. She identified State's Exhibit 1 as a disc with two 9-1-1 calls made on February 13, 2017, at 10:51:55 and 10:52:59. It appears that the first 9-1-1 call was made by David and Michelle Keller and that the second 9-1-1 call was made by Jamie Jacobs. Although both calls were played for the jury, it is unclear which

call was played first.[5]  Also, the record reflects that defense counsel did not object to one of the 9-1-1 calls, but that he did object to the other one.  However, it is unclear from the record which call he objected to.  Also, the record shows that after defense counsel objected, he asked to approach, and there was a "Sidebar: off the record."

In one of the 9-1-1 calls, a woman who said her name was "Jamie," and who was later identified as Jamie Jacobs, stated that she lived at 1760 East Frisco Drive.  Ms. Jacobs reported that she had just gotten home with her kids and believed she heard some shooting, which she described as "bam, bam, bam, bam, bam."  She stated that the shots were close by, but not right next to her.  She explained that she was unsure where the shots were coming from and wanted someone to come and check it out.

The other 9-1-1 call was initiated by a man who was later identified as Mr. Keller.  Mr. Keller told the 9-1-1 operator that his wife was sitting outside "just now," when she heard gunshots and saw three people run into a house towards the end of the street.  Mr. Keller said that he was watching the people running away "right now," explaining that he saw four black males running and getting into a black car.  He stated that the car sped off and was going towards Belle Terre Boulevard.  Mr. Keller reported that it was the second to last house from the church on the right side of East Frisco Drive.  He said that he was eight houses down.  Mr. Keller stated that he did not see what the men were wearing and that he did not hear the gunshots, but his wife did.

At that point, Mrs. Keller got on the phone and told the 9-1-1 operator that she heard at least five shots, after which a couple of seconds passed, and then she

---

[5] Detective Barlow testified that he did not know who called first and who called second. He later testified that Ms. Jacobs was the second caller.  In closing arguments, the prosecutor indicated that the first 9-1-1 call was made by Mr. and Mrs. Keller.

heard two more gunshots.  Mrs. Keller explained to the 9-1-1 operator that as soon as she heard the last gunshot, a black car came racing down the road, "pulled into the house real fast," and three guys got out and ran up to the house.  She stated that she knew the guy who lived at that house, explaining that he was arrested approximately two weeks prior for starting a fight.  Defense counsel did not cross-examine Ms. Abbate.

During his cross-examination, Detective Barlow testified that he made an error in his report, namely, that the 9-1-1 caller stated that she saw a car pull up before she heard gunshots.  He clarified that the caller heard gunshots and then saw a car pull up.  He explained that both 9-1-1 callers stated that they heard gunshots and called right away.  Detective Barlow stated that Mrs. Keller did not give a time as to when she heard the gunshots.  He also testified that he made a mistake in his report when he wrote that at 10:30, Mrs. Keller was outside her home.  He explained that he should have written 10:50.  Detective Barlow also testified that according to his report, Ms. Jacobs made a 9-1-1 call and indicated that at approximately 10:51 p.m., she heard gunshots.  He testified that the two 9-1-1 callers gave consistent information.

During his redirect examination, Detective Barlow testified that he had the opportunity to interview Ms. Jacobs.  Detective Barlow explained that Ms. Jacobs was the second 9-1-1 caller and she lived directly next door to the victim.  Detective Barlow testified that Ms. Jacobs arrived home and got her kids inside; she was not the caller who was outside.  He further testified that a short time later, she heard gunshots, "got her kids down," and called 9-1-1.  Detective Barlow thereafter indicated that he recognized "the video" and it had been provided through his report.

Afterwards, a video was played for the jury which the prosecutor advised was a recording of the detective's interview of Ms. Jacobs. Detective Barlow

subsequently testified that Ms. Jacobs did not see any vehicles in the driveway of the victim's house before she went inside. He also provided that Ms. Jacobs said she sat outside for two minutes, went inside, and two minutes later, she heard the gunshots and called 9-1-1 at 10:51. Detective Barlow maintained that there was no vehicle in the driveway at 10:48.

On the second day of trial, defense counsel asked the trial judge to strike the 9-1-1 calls that were played and to admonish the jury to disregard the 9-1-1 calls because they violated defendant's right to confront the 9-1-1 callers. He cited *Crawford v. Washington*, *infra*, in support of his argument. The prosecutor responded that the 9-1-1 calls fell within a hearsay exception. He further responded that the right of cross-examination did not exist for the 9-1-1 callers. He argued that defendant's constitutional rights were not violated. The trial court stated, "Well, admonition will come. I will place it right before the jury charges." Defense counsel responded, "That's fine, Your Honor." The trial judge said that would give him the opportunity to conduct further research and he would probably make his decision prior to any admonition.

After the State and the defense rested, and jury was escorted out of the courtroom, the trial judge stated that he was declining to issue an admonition to the jury about the 9-1-1 calls. He ruled that the argument made by the defense about the Confrontation Clause did not apply to the 9-1-1 calls because they were non-testimonial in nature. The trial judge also said that the *Davis* case indicated "that particular situation does not afford itself to be a challenge by the confrontation clause of the constitution." Defense counsel responded that the 9-1-1 calls in this case were testimonial in nature and offered to prove the matter asserted. He pointed out that Mr. Keller told the 9-1-1 operator about something his wife had seen. He argued that by playing the 9-1-1 calls, the defense was denied the opportunity to cross-examine the witnesses.

Following defendant's convictions, the defense filed a motion for a new trial. At the hearing on the motion for a new trial, defense counsel argued, in part, that the motion should be granted because defendant was denied the right to confront the witnesses against him. He argued that the trial court erred in allowing the tape made by the police of their interview with a witness to be played at trial. Defense counsel also argued that defendant's right of confrontation was violated when the 9-1-1 caller told her "boyfriend" something, and he in turn told the police, which was inadmissible hearsay. He argued that the ends of justice would be served by the granting of a new trial with respect to the violation of his right of confrontation.[6]

At the hearing, the prosecutor responded that the 9-1-1 tapes were clearly admissible under *Davis v. Washington*. He further responded that the video in question was introduced when defense counsel opened the door by questioning the witness about interviews for impeachment purposes. Defense counsel answered that it was not the 9-1-1 tapes at issue, it was the interview of the woman after the incident that was played for the jury. He explained that he was unable to cross-examine her, which violated the Confrontation Clause.

The trial judge subsequently denied the motion for a new trial.

The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the

---

[6] La. C.Cr.P. art. 851 provides the grounds for a new trial in pertinent part as follows:

A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur: …

   5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

right to confront witnesses against him. *State v. Jackson*, 03-883 (La. App. 5 Cir. 4/27/04), 880 So.2d 841, 852, *writ denied*, 04-1399 (La. 11/8/04), 885 So.2d 1118.

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The Court held that the admission of a recorded statement made by the defendant's wife during interrogation violated the defendant's right under the Confrontation Clause because the statement was hearsay, because it was testimonial in nature, and because his wife did not testify at trial due to the State's marital privilege. *Id.*

In *Davis*, the United States Supreme Court considered the meaning of "testimonial statements" in the context of the Confrontation Clause, wherein the victim called 9-1-1 to report a domestic altercation with her ex-boyfriend. During the call, the victim identified her attacker and described the specifics of the ongoing assault in response to the 9-1-1 operator's questions. *Davis*, 547 U.S. at 817-18, 126 S.Ct. at 2271. The trial court admitted the recording of the 9-1-1 call into evidence despite the fact that the victim did not testify at trial. *Davis*, 547 U.S. at 822, 126 S.Ct. at 2273-74. The *Davis* Court explained that the recordings were non-testimonial in nature and admissible because they were made to enable police assistance to meet an ongoing emergency. *Id.* It also stated that recordings are testimonial when the circumstances objectively indicate there is no ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later a criminal prosecution. *Id.*

The *Davis* Court reasoned that the statements were non-testimonial because the initial interrogation conducted in a 9-1-1 call is ordinarily not designed to prove some past fact, but to describe current circumstances requiring police assistance.

*Davis*, 547 U.S. at 827, 126 S.Ct. at 2276. The *Davis* Court stated that the questions posed and the circumstances of the call indicated that the primary purpose was to enable police assistance to meet an ongoing emergency. The Court also found that the statements were non-testimonial because the victim's answers were frantic and provided over the phone, in an environment that was not tranquil or even safe. *Id.*

In determining whether a statement is testimonial or non-testimonial, courts have applied a three-part inquiry to evaluate the "primary purpose" of the statements. *See State v. Payne*, 17-553 (La. App. 5 Cir. 10/17/18), 258 So.3d 1015, 1022-23, *writ denied*, 18-1932 (La. 4/15/19), 267 So.3d 1122. The first consideration is whether there was an ongoing emergency. The existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important factors in determining the "primary purpose" of an interrogation. This is a "highly context-dependent inquiry." The existence *vel non* of an ongoing emergency, however, is not dispositive of whether a statement is testimonial. *Id.* at 1022. The second consideration is the formality of the interrogation. More formal interrogations are generally indicative of non-emergency situations and "testimonial" statements being given. *Id.* The third consideration is the "primary purpose" of the interrogation based on the statements and actions of both the declarant and the interrogator. This inquiry examines both parties as reasonable actors in their actual circumstances, including the severity of the victim's injuries. *Id.* at 1023.

In the instant case, when the 9-1-1 calls were admitted into evidence and played for the jury, defense counsel lodged an objection to one of them. However, it is unclear which 9-1-1 call he objected to and what his exact objection was because it was made at a bench conference that was not transcribed. Pursuant to La. C.Cr.P. art. 841(A), an irregularity or error cannot be availed of after verdict

unless it was objected to at the time of occurrence.  Thus, in order to seek appellate review of an alleged trial court error, a party must make a contemporaneous objection at trial, and he must state the grounds for the objection.  *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 838, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2.  Because it is unclear which 9-1-1 call defense counsel objected to, the admissibility of both calls is addressed below.

Upon review, we find that both 9-1-1 calls were properly admitted at trial.  The record reflects that the custodian of 9-1-1 calls identified State's Exhibit 1 as a disc with two 9-1-1 calls made on February 13, 2017, at 10:51:55 and 10:52:59, respectively.  With respect to Ms. Jacobs' 9-1-1 call, she reported hearing gunshots nearby.  As to Mr. Keller, he called 9-1-1 and reported that his wife was sitting outside "just now," when she had heard gunshots and saw three people run into a house down the street.  Mr. Keller also reported that he was presently observing four black males running from the house, getting into a car, and fleeing the scene.  Defendant argues on appeal that Mr. Keller's call should not have been played because he relayed information seen and heard by his wife and not him.  However, the 9-1-1 call reflects that Mrs. Keller herself immediately got on the phone after her husband and told the 9-1-1 operator what she had just witnessed, namely, that she heard at least five shots, after which a couple of seconds passed, and then she heard two more gunshots.  Mrs. Keller then explained to the 9-1-1 operator that as soon as she heard the last gunshot, a black car came racing down the road, "pulled into the house real fast," and three guys got out and ran up to the house.

As to the first consideration, whether there was an ongoing emergency, we find that the information relayed to the 9-1-1 operator in both calls was necessary to evaluate and resolve an ongoing emergency, namely, that gunshots were very recently fired, a car pulled up, and three people ran inside, after which four black males ran outside and fled in a car.

Regarding the second consideration, the formality of the interrogation, the 9-1-1 calls were non-testimonial. The conversations between the 9-1-1 operators and the 9-1-1 callers indicate that they were not in formal settings such as police stations, but were during 9-1-1 phone calls in the immediate aftermath of the incident and prior to the arrival of any medical services or the police. The questions asked by the operators related to the location of the gunshots and the fleeing men. These facts support that the statements were informal and non-testimonial.

The third consideration, the primary purpose of the interrogation, further indicates that the 9-1-1 calls were non-testimonial. The questioning during the calls was not part of an investigation into past criminal conduct. Ms. Jacobs and Mr. Keller called 9-1-1 to request police assistance and to describe the immediate incident. Both of them, as well as Mrs. Keller, informed the operators about the incident and provided details of it, including hearing gunshots and observing the individuals entering and then leaving the victim's house. All of these factors show that the purpose of the calls was to obtain emergency assistance.

Based on the foregoing considerations, we find that the 9-1-1 calls at issue here were non-testimonial. Non-testimonial statements do not cause the declarant to be a witness within the meaning of the Sixth Amendment and thus are not subject to the Confrontation Clause. *State v. Harris*, 15-485 (La. App. 5 Cir. 4/13/16), 190 So.3d 466, 480, *writ denied*, 16-902 (La. 5/12/17), 220 So.3d 746. (*See also Payne*, 258 So.3d at 1021-24 (9-1-1 call was non-testimonial because the shooting at issue involved an "ongoing emergency"; questioning was informal, occurred in the immediate aftermath of the shooting and before emergency services arrived; and the 9-1-1 operator's questioning was to enable police assistance)). Therefore, the admission of the non-testimonial 9-1-1 calls did not violate

defendant's right of confrontation, and accordingly, the trial court did not err in admitting them into evidence.

Defendant also argues on appeal that an interview the police conducted with one of the 9-1-1 callers after that call would clearly meet the definition of a testimonial statement. Defendant contends that the trial court erred in admitting this interview into evidence as he did not have the opportunity to confront and cross-examine his accuser.

As was set forth in detail above, the record reflects that during the redirect examination of Detective Barlow, a video was played for the jury. Once the video was played, the prosecutor indicated that the jury had just watched the detective's interview of Ms. Jacobs. However, the video was not marked as an exhibit and was not contained on the exhibit list. There was no objection to the playing of this video or to Detective Barlow's testimony regarding the video.

The motion for a new trial is based on the supposition that injustice has been done to the defendant, and unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La. C.Cr.P. art. 851(A). With respect to defendant's claim that the "ends of justice" would be served by a new trial, this Court has previously held that such a claim presents nothing for appellate review. *See State v. Daniels*, 15-78 (La. App. 5 Cir. 9/23/15), 176 So.3d 735, 740, *writ denied*, 15-1997 (La. 11/29/16), 211 So.3d 386.

Even though defendant raised this issue in the motion for a new trial, defense counsel failed to lodge a contemporaneous objection under La. C.Cr.P. art. 841(A) to the playing of this video or the detective's testimony about the video at trial. As such, defendant is precluded from raising this issue on appeal.[7]

---

[7] *See State v. Thompkins*, 18-1032 (La. App. 1 Cir. 2/27/19), 273 So.3d 346, 350, *writ denied*, 19-666 (La. 9/17/19), 278 So.3d 973 ("The untimely objection in the motion for new trial failed to resurrect the issue waived by lack of a contemporaneous objection."). *See also State v. Chester*, 19-363 (La. App. 5 Cir. 2/3/21), 314 So.3d 914, 975, *writ denied*, 21-350 (La. 6/8/21),

Considering the foregoing, these assignments of error are without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In this assignment, defendant argues that the trial court erred by refusing to release a juror[8] who, after trial commenced but before the first witness was called, informed the trial court that the juror was friends with one of the State's primary witnesses. Defendant further argues that because the relationship was brought to the trial court's attention at a point that would have caused no inconvenience to replace the tainted juror with an alternate, the trial court abused its discretion by failing to abide by the defense's wishes that the juror be replaced.

The State responds that the alleged friendship in the instant case is through Facebook. It further responds that the juror testified that he/she had no relationship outside of Facebook and no communication with the witness in question. The State asserts that the juror also indicated that his/her Facebook contact with this witness would not affect his/her ability to be fair and impartial, nor would the juror give this witness's testimony more credit than anyone else. It points out that the juror established that the witness was someone he/she knew as a result of being in the same community. The State maintains that the law does not require that a jury be composed of individuals who are totally unacquainted with the parties; rather, the law requires that jurors be fair and unbiased. The State submits that the trial court did not abuse its discretion in its ruling.

The record reflects that after defense counsel's opening statement and prior to the first witness being called at trial, the trial judge informed the prosecutor and defense counsel that the bailiffs had advised that there was a juror who said that he/she was Facebook friends with Ms. Lumar, the victim's girlfriend. The trial

---

317 So.3d 321 ("Similarly, in this case, we find that Defendant raising his claim in his motion for new trial does not suffice as a contemporaneous objection under La. C.Cr.P. art. 841.").

[8] Because of privacy concerns, we will not identify the juror in question by name or gender in this opinion.

judge stated that the juror wanted to disclose that information after hearing oral arguments. He said that he would allow defense counsel and the prosecutor to speak to the juror to determine whether he/she would remain a juror or be excluded. Defense counsel requested that the juror be replaced with an alternate juror. The prosecutor thought they should have a brief colloquy with the juror. The trial judge allowed the juror to testify.

The juror subsequently testified that he/she was not aware that Ms. Lumar would be involved in this case. The juror explained that he/she knew Ms. Lumar but not personally and they grew up in Edgard, which was a small town. The juror stated that they did not go to school together, but they were Facebook friends. The juror further stated that they did not have any relationship outside of being Facebook friends. The juror provided that they had never posted information on each other's Facebook page and they had never sent messages to each other.

The juror testified that Ms. Lumar had not communicated any information about this case to him/her. The juror submitted that Ms. Lumar's being a witness would not affect his/her ability in any way to be fair and impartial. The juror further testified that he/she did not think he/she would give Ms. Lumar's testimony more credit than anyone else's. The juror asserted that he/she was just friends with Ms. Lumar on Facebook because they lived in the same community. The juror stated that he/she did not know Ms. Lumar personally. The juror estimated that he/she had 400 or 500 Facebook friends.

The juror testified that he/she did not know Ms. Lumar's telephone number. The juror also testified that the fact that he/she lived in the same community with Ms. Lumar and was Facebook friends with him/her would not weigh in his/her ability to not give Ms. Lumar some leniency in terms of her testimony as compared to other witnesses. The juror was not sure how long he/she had been Facebook friends with Ms. Lumar, but believed it was more than a year. The juror testified

that he/she joined Facebook in 2016 and he/she was unsure if the Facebook page said how long a person had been his/her friend.

Following the juror's testimony, the trial judge said he was going to keep the juror as a member of the jury. After the juror left the courtroom, defense counsel argued that the juror should be replaced out of an abundance of caution in this serious murder trial. The trial judge responded that he was compelled to follow the law and based on the presentation made to the court, he found no grounds to exclude the juror from serving as a juror at that time. Defense counsel noted his objection for the record.

La. C.Cr.P. art. 789 provides, in pertinent part: "… Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. …" The trial court has discretion to utilize the service of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action. *State v. Tatum*, 09-1004 (La. App. 5 Cir. 5/25/10), 40 So.3d 1082, 1093 n.21 (citing *State v. Fuller*, 454 So.2d 119 (La. 1984)).

The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased. *State v. Williams*, 00-1134 (La. App. 5 Cir. 3/28/01), 783 So.2d 566, 567 (citing *State v. Shelton*, 377 So.2d 96 (La. 1979)). A juror's disclosure during trial that the juror knows or is related to a witness or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. *State v. Stewart*, 08-1265 (La. App. 5 Cir. 5/26/09) 15 So.3d 276, *writ denied*, 09-1407 (La. 3/5/10), 28 So.3d 1003. The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a fair verdict. *Id.*

Upon review, we find that the trial court did not abuse its discretion by refusing to replace the subject juror with an alternate juror. The juror's testimony did not support a finding that the relationship between him/her and Ms. Lumar was sufficient to preclude the juror from arriving at a fair verdict. Also, the connection between them was not such that one must reasonably conclude that it would influence the juror in arriving at a fair verdict. *See Stewart*, *supra*.

Here, the juror testified that he/she was Facebook friends with Ms. Lumar; however, the juror maintained that he/she did not know Ms. Lumar personally, they never sent messages to each other, and Ms. Lumar did not communicate anything to him/her about the instant case. Further, the juror indicated that he/she would be fair and impartial despite the fact that he/she and Ms. Lumar were Facebook friends. The juror also testified that he/she would not give Ms. Lumar's testimony more credibility than any other witness's testimony. As such, we find that the trial court did abuse its discretion in its ruling on this issue. This assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

Upon review, we find that the trial judge failed to completely advise defendant of the provisions of La. C.Cr.P. art. 930.8. The transcript reflects that the trial judge stated: "We are maintaining Mr. Bardell's … right to file a Petition for Post-Conviction Relief within that two year window as prescribed in the statute." The minute entry provides: "Defendant has a two (2) year prescriptive period in which to file for post conviction relief that period to commence after judgment of conviction and sentence have become final." The transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

23-KA-55                                          22

If a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *See State v. Becnel*, 18-549 (La. App. 5 Cir. 2/6/19), 265 So.3d 1017, 1022. Accordingly, by way of this opinion, defendant is advised that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## DECREE

For the foregoing reasons, defendant's conviction and sentence are affirmed.

## AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 15, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**23-KA-55**

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE J. STERLING SNOWDY (DISTRICT JUDGE)
HONORABLE BRIDGET A. DINVAUT           ORENTHAL J. JASMIN (APPELLEE)           GWENDOLYN K. BROWN (APPELLANT)
(APPELLEE)

**MAILED**